UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHITNEY DESIGN, INC., | ) | Case No. 09-51928 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF MARK J. BROWN IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS REQUESTS FOR FIRST-DAY RELIEF

Mark J. Brown declares, pursuant to 28 U.S.C. § 1746 states as follows:

### FILING INFORMATION

1.     I am the Senior Vice President and Chief Financial Officer of Whitney Design, Inc. ("Whitney" or the "Debtor").  I am familiar with the Debtor's businesses, financial affairs and day-to-day operations.

2.     I submit this Declaration in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), and the Debtor's First Day Pleadings (as defined below).

3.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtor's business operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge, my review of the relevant documents or my opinion.

4.     Whitney commenced reorganization case on November 21, 2009 (the "Petition Date") by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.

5.     On the Petition Date, Whitney filed the following pleadings (collectively, the "First Day Pleadings"):

a. Motion For Order Authorizing (A) Continued Maintenance Of Existing Bank Accounts, (B) Continued Use of Existing Cash Management Systems, and (C) Continued Use Of Existing Business Forms (the "Cash Management Motion");

b. Motion For Entry Of Interim Order and Final Order Authorizing (A) Use of Cash Collateral; (B) Entering into Post-Petition Financing Arrangements (C) Granting Secured, Superpriority Claims and Liens; and (D) Granting Adequate Protection (the "DIP Motion");

c. Debtor's Motion For Entry of an Order Authorizing (A) Payment of Prepetition Employee Obligations and Continuation Of Employee Benefit Plans and Programs Postpetition; (B) Confirming that the Debtor is Able to Pay Withholding And Payroll-Related Taxes; and (C) Directing All Banks To Honor Prepetition Checks For Payment Of Employee Obligations (the "Employee Motion"); and

d. Motion For Entry Of An Order Authorizing Payment Of Prepetition Claims Of Shippers ("Shippers Motion")

## CORPORATE BACKGROUND

6. The Debtor is a wholly owned subsidiary of Tricor Consumer Products, Inc., a Delaware corporation ("Tricor"). The principal shareholders of Tricor are James L. Glenn and Mark J. Brown.

7. The Debtor was formed in 1994, and is in the business of importing and distributing household goods, including steel-top ironing boards, ironing board pads and covers, hampers, and sorters. The Debtor also imports and distributes laundry care accessories, outdoor clothes dryers, clothing organizers, wicker storage items and travel accessories.

8. The Debtor imports substantially all of its products from vendors in China. Its customers are retailers located primarily through the United States, including big box retailers, hardware stores, specialty stores, internet retailers, and distributors.

9. The Debtor's offices are located in Hazelwood, Missouri. It employs approximately 46 people on a full time basis and also has relationships with approximately 15 independent sales agents throughout the United States.

10.     The Debtor's gross revenues for 2008 were $40,425,593.  Gross revenues in the first 10 months, through October 31 of 2009, are $30,585,000.

## CAPITAL STRUCTURE

11.     Prior to the Petition Date, the Debtor was liable to Enterprise Bank & Trust ("Enterprise" or the "Bank") for all indebtedness, liabilities and other obligations of the Debtor under (a) that certain Loan and Security Agreement, dated May 5, 2008 (the "Enterprise Prepetition Loan Agreement"), (b) that certain Revolving Credit Note, dated May 5, 2008, in the original amount of $7,500,000.00 (the "Enterprise Prepetition Line of Credit Note"; together with the Prepetition Loan Agreement, the "Enterprise Prepetition Credit Agreement"); and (c) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Bank, including, without limitation, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as amended, modified or supplemented and in effect the "Enterprise Prepetition Loan Documents").

12.     As of the Petition Date, the Debtor was indebted under the Enterprise Prepetition Loan Documents on account of Debtor's Obligations (as defined in the Enterprise Prepetition Loan Documents) to the Bank, in the aggregate principal amount of approximately $5,254,329.37, plus, interest accrued and accruing (at the rates set forth in the Enterprise Prepetition Loan Documents), costs, expenses, fees (including attorneys' fees and legal expenses), other charges (in each case, to the extent reimbursable under the Enterprise Prepetition Loan Documents) and other obligations (collectively the "Enterprise Prepetition Obligations").

13.     To secure the Enterprise Prepetition Obligations, the Debtor granted blanket security interests and liens (the "Enterprise Prepetition Liens") to Enterprise on the personal property of the Debtor and the proceeds thereof, including the Cash Collateral, as described and defined as "Collateral" in the Enterprise Prepetition Loan Documents (collectively, the "Enterprise Prepetition Collateral").

14.     Prior to the Petition Date, the Debtor was liable to Eagle Fund I, L.P. ("Eagle") for all indebtedness, liabilities and other obligations of the Debtor under (a) that certain Note and Warrant Purchase Agreement, dated as of January 19, 2006, by and among the Debtor and Eagle, (b) that certain Promissory Note in the original principal amount of $1,500,000, dated as of January 19, 2006, issued by the Debtor in favor of Eagle, (c) that certain Warrant, dated as of January 19, 2006, issued by Tricor to Eagle pursuant to which Tricor agreed to repurchase certain contractual rights from Eagle for $1,331,500.00, and (d) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Eagle, including, without limitation, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as amended, modified or supplemented and in effect, the "Eagle Prepetition Loan Documents" and, together with the Enterprise Prepetition Loan Documents, the "Prepetition Loan Documents").

15.     As of the Petition Date, the Debtor was indebted under the Eagle Prepetition Loan Documents (a) on account of Debtor's Obligations (as defined in the Eagle Prepetition Loan Documents) to Eagle, in the aggregate principal amount of approximately $2,831,500, plus, interest accrued and accruing (at the rates set forth in the Eagle Prepetition Loan Documents), costs, expenses, fees (including attorneys' fees and legal expenses), other charges (in each case,

to the extent reimbursable under the Eagle Prepetition Loan Documents) and other obligations (collectively the "Eagle Prepetition Obligations" and, together with the Enterprise Prepetition Obligations, the "Prepetition Obligations").

16.     To secure the Eagle Prepetition Obligations, the Debtor granted blanket security interest and liens (the "Eagle Prepetition Liens") to Eagle on the personal property of the Debtor and the proceeds thereof, including the Cash Collateral, as described and defined as "Collateral" in the Eagle Prepetition Loan Documents (collectively, the "Eagle Prepetition Collateral" and, together with the Enterprise Prepetition Collateral, the "Prepetition Collateral").

17.     Enterprise and Eagle entered into a Subordination Agreement on May 5, 2008 wherein, *inter alia*, the parties agreed that Enterprise's security interest in Debtor's assets would be prior and senior in all respects to Eagle's security interests.

18.     As a result of the foregoing, as of the Petition Date, Enterprise holds a valid, perfected, first priority security interest in Debtor's assets to secure repayment of the Enterprise Indebtedness, and Eagle holds a valid, perfected, second priority security interest in Debtor's assets to secure repayment of the Eagle Indebtedness.

## ANTIDUMPING LIABILITIES

19.     The Department of Commerce states that "dumping" occurs when a foreign producer sells a product in the United States at a price that is below that producer's sales price in the country of origin, or at a price that is lower than the cost of production.  Since February 3, 2004, the Debtor, and all other importers of floor-standing steel-top ironing boards from the Peoples Republic of China ("PRC") into the U.S. are subject to the imposition of "anti-dumping" duties.

20.     These anti-dumping rates range from 0% to 157.68% of the FOB purchase price in the PRC.  The anti-dumping duties vary for each specific PRC producer and the U.S. importer is responsible for

payment of the anti-dumping duties to U.S. Customs. The U.S. importer is required to post deposits with the US Customs to secure payment of potential anti-dumping duties.

21.    Anti-dumping deposit rates for each PRC supplier of steel-top ironing boards are initially estimated by the Commerce Department ("Estimated DOC Deposit Rate"). Thereafter, usually about 18 months after the annual period of review (the "Review Period"), the Commerce Department makes an annual determination of the actual deposit rate based on audits performed in the PRC factory ("DOC Audited Rate"). Any change in the rate is retroactive to include all steel-top ironing boards imported during the Review Period. The DOC Audited Rates may be appealed to the Court of International Trade and the appeal process may take years to resolve. PRC factory or an affected U.S. producer of the same products may all appeal. Once the appeal is resolved, the anti-dumping deposits are either refunded, with interest, or additional amounts are due, with interest.

22.    The Debtor imported all of its steel-top ironing boards from Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") in the PRC from February 3, 2004, when the anti-dumping duties were first imposed until April of 2009.  There were five separate Review Periods during the time the Debtor purchased its steel-top ironing boards from Since Hardware as follows:

| Review Period | Review Dates | Approximate Amount Purchased from Since Hardware |
|---|---|---|
| 1 | 2/3/04 through 7/31/05 | $4,725,000 |
| 2 | 8/1/05 through 7/31/06 | $4,302,000 |
| 3 | 8/1/06 through 7/31/07 | $3,777,000 |
| 4 | 8/1/07 through 7/31/08 | $7,229,000 |
| 5 | 8/1/08 through 7/31/09 | $2,993,000 |

23.     During Review Periods 1 and 2, the Commerce Department initially required the Debtor to post deposits for anticipated anti-dumping duties in the amount of approximately $852,000.  Thereafter, however, the Commerce Department lowered the DOC Audited Rate to zero, but Home Products International, Inc. ("HPI"), the only domestic manufacturer of steel-top ironing boards appealed the DOC Audited Rate.  The appeals for these periods are still pending and the Commerce Department will not refund the deposits while the HPI appeal is pending.

24.     At the beginning of Review Period 3, the Commerce Department required the Debtor to deposit 9.47% of the purchase price of steel-top ironing boards purchased from Since Hardware.   Fairly early during that Review Period, however, the Commerce Department reduced the deposit rate to 0% based on the favorable audits of Review Periods 1 and 2.  In April of 2009, the Commerce Department, however, issued a new rate for Since Hardware of 157.68%, the so-called "Penalty Rate".   Upon information and belief, the Commerce Department issued the Penalty Rate because Since Hardware failed to cooperate with certain Commerce Department audits and procedures.  Since Hardware appealed this rate change to the Court of International Trade and this appeal is pending.

25.     It is important to emphasize that the Debtor had nothing to do with the increase to the Penalty Rate.  The Commerce Department based its decision solely on Since Hardware's conduct and its books and records.   The Debtor did not know that Since Hardware was falsifying data or otherwise not cooperating with the Commerce Department.  Nevertheless, under applicable law, the Debtor is liable for payment of the anti-dumping duty even though it had no prior knowledge of the alleged dumping.

26.     The DOC Audit Rate has not yet been established for Review Periods 4 and 5. Both of these periods for Since Hardware will be reviewed together by the Commerce Department and that review is ongoing. The Debtor stopped purchasing products from Since Hardware when the Commerce Department imposed the Penalty Rate in March of 2009.  At the present time, however, the Debtor is funding all costs associated with the review of these periods and is uncertain of the final determination.  The Debtor anticipates the results of the preliminary ruling by August of 2010 and that costs associated with the review of these two Review Periods alone could exceed $250,000.

27.     Because of the Commerce Department's ability to collect duties based on purchases made in past years and the continued appeals of Review Periods 1 through 3 by HPI, the Debtor faces substantial contingent and unliquidated liabilities.   The Debtor purchased from Since Hardware steel-top ironing boards having a total price of approximately $23,026,000 in Review Periods 1 through 5.  If the Penalty Rate is ultimately applied on all of those purchases, the Debtor will owe (net of deposits) approximately $35.1 million. To put this amount in perspective, the Debtor has calculated that the after-tax profit margin on all of the steel-topped steel-top ironing boards sold during the relevant Review Periods totals only a bit more than $1.2 million.

28.     After learning of the imposition of the Penalty Rate in March of 2009, the Debtor stopped purchasing steel-top ironing boards from Since Hardware.  Thereafter, the Debtor began purchasing steel top steel-top ironing boards in April of 2009 from Foshan Shunde Yongiian Housewares & Hardware Co., Ltd. ("Foshan Shunde").  At the time the Debtor began purchasing product from Foshan Shunde in April of this year, Foshan Shunde had an Estimated DOC Deposit Rate of 2.7%.  On Septembers 8, 2009, the Debtor learned that Foshan Shunde's rate had

increased to the Penalty Rate effective in mid-January of 2010. As a result of these experiences, the Debtor has determined that it will exit the steel-top ironing board business and will instead focus its ironing board business on products that are not subject to anti-dumping duties.

29. While the Debtor believes that the ultimate result of its appeals will reduce the anti-dumping exposure substantially, these appeals will take years to resolve and success is uncertain. The cost of the appeals will be several hundred thousand dollars.

30. Moreover, the Debtor has been informed that U.S. Customs does not settle these sorts of claims and that continued, interminable litigation is inevitable. In the meantime, the Debtor's PRC vendors for its other, non-ironing board products, have become aware of the potential anti-dumping duties and have reduced, or in some cases, suspended trade credit.

31. The Debtor was recently approached by Wal-Mart to import a new closet storage product (the "Canopy Product"). Because of the overwhelming unliquidated liabilities associated with anti-dumping, the Debtor cannot obtain financing from Enterprise, Eagle, or any other source to invest in the Canopy Product opportunity. Moreover, since the appeals of the anti-dumping duties are likely to continue for many years to come, there is no reasonable prospect that the Debtor will be able to locate financing to take advantage of the Canopy Product opportunity. The anti-dumping liabilities became known just as the Debtor was beginning to experience diminished sales due to the worldwide economic recession.

32. Decreased revenues combined with unknown and potentially substantial retroactively imposed anti-dumping liability has led to insufficient liquidity and credit to efficiently and properly operate the Debtor's business or to exploit opportunities for new business. Enterprise has been unwilling to allow the Debtor to borrow in excess of its borrowing base formula on a prepetition basis without an additional guarantee, partially backed by personal

assets, from James Glenn and myself. The Debtor intends to file a motion to sell substantially all of its assets free and clear of liabilities. James Glenn and I formed a limited liability company which will submit a bid for these assets.

33.     The Debtor and its professionals are mindful of the potential conflicts of interest in this situation.   In order to market the Debtor's assets to other potential bidders and to instill confidence in the marketing process, the Debtor has retained Brent Baxter and Clayton Capital Partners to act as the "Chief Sales Officer" in connection with this case. Mr. Baxter and his firm will oversee all aspects of the marketing efforts and will serve as the primary liaison between the Debtor and potential bidders.    Mr. Baxter has submitted his own declaration in support of the Debtor's Motion to Appoint Chief Sales Officer filed on the Petition Date.

## CASH MANAGEMENT MOTION

34.     The Debtor has two bank accounts; one of which is maintained with Enterprise Bank & Trust (the "Enterprise Account"), and the other is maintained with Bank of America, N.A. (the "B of A Account", and together with the Enterprise Account, the "Prepetition Bank Accounts").

35.     The Enterprise Account is used for customer collections and vendor disbursements. Any excess cash within the Enterprise Account is used to pay down the $7,500,000.00 revolving credit facility (the "Loan") provided to the Debtor by Enterprise Bank & Trust. The Loan is used to fund the Enterprise Account in the event there is an inadequate level of cash available to fund daily needs. The B of A Account is used for payroll purposes and is funded every two weeks via either ACH or wire transfer from the Enterprise Account.

36.     The foregoing cash management system (the "Cash Management System") constitutes an ordinary course, essential business practice providing significant benefits to the

Debtor, including the ability to control corporate funds and to ensure the available of funds when needed. Any disruption of the Cash Management System would have a severe and adverse impact on the Debtor and its reorganization efforts.

37.     In furtherance of these goals, the Debtor requests that Enterprise Bank & Trust and Bank of America, N.A. be authorized and directed to continue to administer the Debtor's Prepetition Bank Accounts as they were maintained before the Petition Date, without interruption and in the usual and ordinary course to pay any and all checks, drafts, wires or ACH transfers issued on the accounts on account of a claim arising on or after the Petition Date so long as sufficient funds are available to pay such amounts.

38.     To minimize expenses to its estate, the Debtor seeks a waiver of the U.S. Trustee's requirement that the Debtor replaces its existing business forms and checks with ones possessing the label "Debtor-in-Possession" and authorization to continue using all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices), and checks existing immediately prior to the Petition Date, without reference to the Debtor's status as Debtor-in-possession.

39.     Most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as Debtor-in-possession as a result of the announcements issued by the Debtor and possible press coverage. Moreover, each of the Debtor's vendors will receive direct notice of the commencement of this case.

40.     Changing correspondence and business forms would be expensive, unnecessary and burdensome to the Debtor's estate, disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor. For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to

place the label "Debtor-in-Possession" on each. The Debtor proposes that in the event that they need to purchase new business forms or checks, such documents will include a legend referring to the Debtor as "DIP."

## EMPLOYEE MOTION

41.     As of the Petition Date, the Debtor employed approximately 46 full and part-time employees (the "Employees").

42.     All Employees are paid on a bi-weekly basis, approximately one week in arrears. All Employees were last paid on Friday, November 13, 2009, for the pay period ending November 7, 2009.  All Employees will be paid next on Wednesday, November 25, 2009, for the pay period ending November 21, 2009.  All Employees will be paid on Wednesday, November 25, 2009, rather than on Friday, November 27, 2009, which would be the normal date for the next payroll, because Thursday, November 26, 2009, and Friday, November 27, 2009, are holidays for all Employees.  This is in the ordinary course of business for a payroll coming due on a company holiday.

43.     Based on the Debtor's ordinary course payroll schedule, the total amount of current earned, but unpaid, prepetition wages and salaries including withholding for payroll taxes for all Employees, is approximately $114,852.17 as of the Petition Date. In addition, some payroll checks from previous work periods may remain outstanding and may need to be reissued due to the Debtor filing for chapter 11 protection.

44.     All of the prepetition wages, salaries and commission payable to any single individual falls below the $10,950 priority limit of section 507(a)(4) of the Bankruptcy Code.

45.     Many of the Employees rely on the timely payment of their compensation to cover their monthly living expenses.

46.     In addition to the payment of Employee wages, salaries, and commissions the Debtor is also obligated pay federal, state and, in some instances, local withholding taxes (the "Taxes"). Most of these Taxes and social security contributions are withheld from payroll by the Debtor's third-party payroll service, Ceridian, and is then paid by Ceridian to the appropriate authorities (the "Taxing Authorities") on a periodic basis from the Debtor's payroll accounts.

47.     Full time Employees are entitled to vacation ("Vacation") after a certain length of service.  The amount of Vacation to which an Employee is entitled is dependent upon the Employee's position and length of service.

48.     The Debtor estimates that the value of all Vacation pay accrued by Employees, but not yet paid by the Debtor, as of the Petition Date is approximately $71,567.05.

49.     The Debtor withholds money from the Employee payroll pursuant to certain Employees' instructions or orders by judicial or administrative authorities (collectively, the "Designated Withholdings") for contributions or remittance to various programs and funds including, supplemental insurance programs, savings plans, child support, garnishments and for other purposes.

50.     Before the Petition Date, certain Employees regularly incurred business expenses, which, consistent with ordinary practice, are reimbursed by the Debtor ("Expense Reimbursements"). These Expense Reimbursements include, without limitation, expenses for travel, auto expenses, telephone charges and meals. The Debtor's policy is to reimburse such Employee expenses upon presentation, assuming they are approved expenses.  The Debtor is unable to accurately quantify the actual unpaid Expense Reimbursement claims at the present time.

51.     Debtor maintains a Workers Compensation Insurance Policy ("WC Policy") through One Beacon America Insurance Company.   The policy period is September 1, 2009 through September 1, 2010.

52.     Before the Petition Date, the Debtor offered its full time Employees certain standard employee benefits (collectively, the "Employee Benefits") that are summarized on **Exhibit A** attached hereto and made a part hereof by this reference.   Failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship to the Employees.

53.     The Debtor pays all payroll and other obligations due to its Employees by check or by direct deposit at the election of the Employee. As a result of the timing of this chapter 11 case, checks previously issued by the Debtor to its Employees may not yet have been presented for payment or may not yet have cleared the banking system and, accordingly, may be dishonored unless the Court authorizes and directs the banks in which the Debtor maintains its payrolls and other disbursements to honor these checks.

54.     Any delay in paying any of the employment related expenses described herein would destroy the Debtor's relationship with its Employees and irreparably impair Employee morale at the very time when the dedication, confidence and cooperation of these Employees are most critical.   The Debtor faces the imminent risk that its operations may be severely impaired if the Debtor is not immediately granted the relief requested in the Employee Motion.   Employee support for the Debtor's restructuring efforts is crucial to the success of those efforts, particularly given the importance of morale and initiative in meeting strict operating standards and schedules.

## SHIPPERS' MOTION

55. The Debtor's supply and delivery system depends upon the use of reputable common carriers, shippers, couriers and truckers (collectively, the "Shippers"). Specifically, the Debtor's ability to obtain goods for its customers depends on the frequent delivery of such goods from its suppliers to the Debtor's warehouse in Hazelwood, Missouri. Further, the Debtor depends on Shippers to deliver the goods from its warehouse to its customers.

56. The Debtor engages the Shippers to transport goods and other materials from its suppliers to the Debtor's warehouse and from the Debtor's warehouse to its customers. As a result, in the ordinary course of the Debtor's business, these Shippers have possession of the Debtor's goods and other materials that are either *en route* from a supplier to the Debtor's warehouse or from the Debtor's warehouse to a customer. The Debtor expects that, as of the Petition Date, certain of the Shippers will have outstanding invoices for goods and other materials that were delivered to, or were in the process of being delivered to, the Debtor's warehouse and for goods and other materials that were delivered to, or were in the process of being delivered to, the Debtor's customers (collectively, the "Shipping Claims"). Although the Debtor has generally made timely payments to the Shippers, as of the Petition Date, the Debtor estimates that the amount that may be outstanding to the Shippers is approximately $90,000.00. The Debtor estimates that the value of the goods in the possession of the Shippers as of the Petition Date is at least $700,000.00.

57. Under most state laws, a Shipper may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[1] Additionally, pursuant to section 363(e) of the Bankruptcy Code, the

---

[1] For example, Uniform Commercial Code § 7-307 provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation

Shippers, as bailees, may be entitled to adequate protection in the form of a possessory lien (the "Statutory Liens"). As a result, certain Shippers may refuse to deliver or release such goods and other materials, as applicable, before their Shipping Claims have been satisfied and their liens released.

58. The Debtor believes that the value of goods and other materials in the possession of the Shippers, and the potential injury to the Debtor if these goods are not released, is likely to exceed greatly the amount of Shipping Claims held by such parties. Indeed, even if the Shippers did not have valid liens under applicable state law, their possession and retention of the Debtor's goods could severely disrupt, and potentially cripple, the Debtor's operations because of its constant need for goods and materials.

59. For these reasons, the Debtor believes that it is necessary and essential to preserve the value of its estate that it be permitted to make payments on account of Shipping Claims for costs incurred in connection with goods or other materials in the Shippers' possession as of the Petition Date.

60. The Debtor submits that it would, in its discretion, attempt to condition any payment on account of a Shipping Claim on the written acknowledgement from the applicable Shipper that it will continue to provide services to the Debtor on trade terms that, at a minimum, such Shipper generally provided to the Debtor prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtor as those in effect prior to the Petition Date. The Debtor reserves the right to negotiate more favorable trade terms with any Shipper as a condition to the payment of any such prepetition claim.

---

(including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."

## DIP MOTION

61.     Pursuant to the DIP Motion, the Debtor is seeking the entry of (i) an interim order authorizing (i) an interim order: (a) authorizing the Debtor to use cash collateral in which Enterprise and Eagle hold an interest, (b) authorizing the Debtor obtain secured postpetition financing up to an aggregate amount not to exceed $2,065,670.00 from Enterprise (the "<u>DIP Loan</u>"), (c) authorizing the Debtor to grant certain liens and other relief to Enterprise and Eagle, and (d) scheduling the final hearing on the DIP Motion under Bankruptcy Rule 4001(c) (the "<u>Final Hearing</u>") within the next 30 days; and (ii) a final order (the "<u>Final Order</u>") approving the use of cash collateral and extension of postpetition credit under Sections 363, 364(c) and (d) of the Bankruptcy Code (collectively referred to as the "<u>Financing Facility</u>").

62.     The Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the DIP Loan and the use of the Cash Collateral.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, to purchase and supply new inventory and otherwise finance its operations, is essential to the Debtor's continued viability.  The Debtor's critical need for financing is immediate.  In the absence of the DIP Loan and the use of the Cash Collateral, serious and irreparable harm to the Debtor and its estates would occur.  In addition, 314 Holdings, a non-debtor affiliate of the Debtor, requires the use of certain of the Bank's and Eagle's collateral (including the cash proceeds of such collateral) to fund its business operations and to preserve its going-concern value for the ultimate benefit of the Debtor and its estate.  The preservation, maintenance and enhancement of the going concern value of the Debtor is of the utmost significance and importance to enabling a sale of substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code for the benefit of Debtor's estate and creditors.

63.     Given the Debtor's current financial condition, financing arrangements and capital structure, the Debtor cannot obtain unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtor: (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve-Out; (ii) securing, pursuant to sections 364(c) and (d) of the Bankruptcy Code, such indebtedness and obligations with security interests in and liens on substantially all of the Debtor's assets as described below; and (iii) providing for adequate protection as described below.

64.     Upon the entry of an interim order granting the DIP Motion, the Debtor and Bank will execute that certain Second Amendment to Loan and Security Agreement and First Amendment to Revolving Credit Note (collectively, with all documents at any time executed in connection therewith, including, but not limited to, that certain Agreement to be executed by and among 314 Holdings, **[Newco]**, the Bank and Eagle, the "DIP Loan Documents"), pursuant to which the Bank will agree to make the DIP Loan to Debtor subject to the satisfaction of conditions set forth therein.

65.     The Debtor requests authorization to comply with and perform all of the terms and conditions of the DIP Loan Documents and to repay amounts borrowed, with interest to the Bank in accordance with the terms and conditions set forth in the DIP Loan Documents and any Order granting the DIP Motion. The Debtor further requests authorization to pay all facility, commitment and other fees and expenses, including without limitation, all reasonable fees and expenses of professionals engaged by the Bank, in accordance with the terms of the DIP Loan Documents. The DIP Loan and all postpetition interest, fees, costs, expenses, indebtedness,

obligations and liabilities of the Debtor to the Bank under the DIP Loan Documents and any Order granting the DIP Motion are hereinafter referred to as the "Postpetition Obligations" and, together with the Prepetition Obligations, the "Obligations".

66.     The Debtor requests authorization to use the proceeds of the DIP Loan and to use the Cash Collateral in the operation of its business and for payment of Chapter 11 expenses, including professional fees, in each case in accordance with a budget to be provided prior to the hearing on the DIP Motion and subject to the DIP Loan Documents and any Order granting the DIP Motion.

67.     A summary of the salient terms of the DIP Loan follows:

| Borrowers: | Tricor Consumer Products, Inc. Whitney Design, Inc. |
|---|---|
| Lender: | Enterprise Bank & Trust Company |
| Facility Type: | Amendment of existing $7.5 million revolving line of credit to provide $2,065,670.00 in postpetition DIP financing |
| Maturity: | 90 days |
| Interest rate: | 7.5% per annum |
| Fees: | $25,000 upon Bankruptcy Court's entry of an Interim Order and $25,000 upon entry of Final Order authorizing the Debtors to borrow under the DIP Facility; and $50,000 upon approval of a sale of substantially all of the assets to Newco. |
| Borrowing Base | (i) 85% of the net amount of Eligible Accounts of Borrowers outstanding at such date; plus<br><br>(ii) the lesser of (A) $4,000,000.00, or (B) 50% of the value of Eligible Inventory of Borrowers at such date calculated on the basis of the lower of cost or market with the cost of raw materials and finished goods calculated on a first-in, first-out basis; minus<br><br>(iii) any Letter of Credit Obligations incurred by Lender on behalf of either Borrower; plus |

| | |
|---|---|
| | (iv) the lesser of (A) $500,000.00, or (B) 100% of the value of the Cash Collateral at such date (provided, however, with respect to any deposit account, securities account or other account which is pledged to Lender, amounts in such account shall be excluded from this calculation until such time as Lender receives a control agreement in form and substance reasonably satisfactory to Lender); plus |
| | (v) $850,000.00 (subject to below). |
| | For purposes hereof, the net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts less any and all returns, rebates, discounts (which may, at Bank's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time. |
| | Notwithstanding anything herein to the contrary, the additional $850,000 (part (v) of the calculation above) shall only be included in the calculation of the Borrowing Base after the Petition Date, and shall be subject to the terms and conditions of the DIP Facility set forth in Section 1.2 of the DIP Loan Documents. |
| **Budget** | Exhibit A to the DIP Motion |
| **Borrowing Amount Before Final Hearing** | $500,000 |
| **Liens** | Section 364(c)(2) lien on any prepetition unencumbered property of the estate to secure Postpetition Obligations |
| | Section 363(d)(1) lien on all Prepetition Collateral to secure Postpetition Obligations |
| | Section 364(c)(3) lien on Prepetition Collateral to secure Postpetition Obligations |
| **Collateral** | All present and after-acquired property of the Debtor of any nature whatsoever, including, without limitation, the Prepetition Collateral, all tangible and intangible personal property and fixtures, real estate, all promissory notes, leasehold interests, all cash, money, certificates, investment property, securities, chattel paper, and other property contained in any account maintained by the Debtor, including all cash and cash equivalents |

| | |
|---|---|
| | maintained in any account maintained by the Debtor with the Bank or any other financial institution, letter of credit rights, books, records, writings, data bases, information, commercial tort claims, and all of the proceeds of -- or property recovered from -- Debtor's causes of action pursuant to chapter 5 of the Bankruptcy Code |
| **Replacement Liens** | As adequate protection for the diminution in value of the Prepetition Collateral, the Bank and Eagle shall be granted (effective upon the date of any Order granting the DIP Motion and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid, perfected and continuing, replacement security interests in, and liens on (the "Replacement Liens") all of the Debtor's right, title and interest in, to and under the Collateral, to the same extent, validity and scope as existed in favor of the Bank and Eagle, as of the Petition Date, subject only to (x) the Carve-Out, and (y) the Liens granted pursuant to any Order granting the DIP Motion and the DIP Loan Documents to Bank to secure the DIP Loan; |
| **Adequate Protection Claims** | As adequate protection for the diminution in value of the Prepetition Collateral, the Bank and Eagle shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority claims (the "Adequate Protection Claims") immediately junior only to (x) the Superpriority Claims granted pursuant to any Order granting the DIP Motion to Bank in respect of the DIP Loan and (y) the Carve-Out; provided, however, that all Adequate Protection Claims granted to Eagle are subordinated to the Adequate Protection Claims granted to the Bank. |
| **Superpriority Claims** | All of the Postpetition Obligations shall constitute allowed claims against the Debtor (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b),726, 1113 and 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, and any successor trustee or any creditor (including Eagle) in the Debtor's chapter 11 case or any subsequent proceedings under the Bankruptcy Code. |

| Carve-Out | The Liens, Replacement Liens, Superpriority Claims and Adequate Protection Claims are all subject to a Carve-Out for (a) payment of quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); (b) the payment of the fees and expenses of counsel and professionals retained by the Debtor and any statutory committee that may be allowed by the Court ("Allowed Fees"), pursuant to sections 327-330 of the Bankruptcy Code (the "Professional Fee Carve-Out"); provided, however, that the amount of Allowed Fees entitled to the protections of the Professional Fee Carve-Out that are attributable to time expended or expenses incurred after the occurrence of an Event of Default under the DIP Loan Documents shall not exceed $25,000 or such other amount as may be subsequently agreed upon by the Bank, Eagle and the professionals; provided, further, provided, further, that Carve-Out shall not include any fees or disbursements arising after the conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code |
|---|---|

68. All of the Debtor's cash constitutes Prepetition Collateral or the proceeds of Prepetition Collateral and, therefore, is cash collateral of the Bank and Eagle within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral").

69. In the Debtor's business judgment, the Financing Facility is the only financing option available in the circumstances of this case. The purpose of the Financing Facility is to enable the Debtor to maintain normal business operations until the completion of this case. I believe that the terms of the Financing Facility are fair and reasonable and are in the best interests of the Debtor's Estate. Accordingly, the Debtor should be granted authority to enter into the Financing Facility.

70. Pending the Final Hearing, the Debtor will require that the Financing Facility be available for, among other things, the orderly continuation and operation of its businesses, to maintain business relationships with vendors and suppliers, and therefore, Debtor requests that the Debtor be authorized to borrow up to $500,000.00 in DIP Loans.

71.     Absent interim relief, the Debtor faces the very real risk of substantial disruption in its business operations and damage to vendors and service provider relationships. Consequently, if interim relief is not obtained, the Debtor's efforts to consummate going-concern sales will be immediately and irreparably jeopardized.

72.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2009

                           */s/ Mark J. Brown*
                           Mark J. Brown

# EXHIBIT A

## Summary Description of Major Employee Benefits

### Health Benefits

The Debtor's health plan is through Anthem.  The in-network benefit is 80% and the out of network is 50%.  Deductibles range from $2,500 for individual and up to 3x for family coverage.  Out of pocket maximums for in-network are $5,000 for individual and 2x for family. Out of pocket maximums for out of network are $10,000.  Office visit co-pays range between $20 and $40.  All employees are eligible.  On average, each employee is responsible for approximately 35% of the premium.

The high deductibles of the Health plan are reimbursed by the Debtor via a 3rd party administrator.  Deductibles are reimbursed after the employee has submitted deductibles over $250.  The Debtor also offers an optional Flexible Spending Account (FSA) whereby each employee may voluntarily contribute, on a pre-tax basis, up to $2,000 to cover health, dental and vision related expenditures.

### Dental Benefits

The Debtor's dental plan is through Guardian.  Hourly warehouse employees are responsible for about 90% of the premium and all other employees are responsible for about 10% of the premium. Preventative services are 100% covered in the plan.  All other services, except orthodontia, are partially covered by the plan.  There is a deductible of $50 per individual and up to 3 times that for family.  The maximum benefit limitation is $500 per person.  Orthodontia is available to non-hourly warehouse employees, subject to a $1,000 maximum.

### Life, Short-Term Disability, Long-Term Disability

Guardian Life Insurance manages the above plans.  The Debtor sponsors 100% of the life premiums for each employee.  Owners are covered up to 1.5 times their annual salary; all other employees are up to 1 times their annual salary.  Employees may add additional coverage for themselves and their family at their expense.

The Debtor sponsors 100% of the Short-Term & Long-term Disability premiums.  Hourly warehouse employees receive a $100 weekly benefit for Short-Term disability and are not eligible for Long-Term disability.  All other employees eligible for Short-Term disability benefits are capped at a maximum of their weekly salary or $1,000, whichever is lower. Long-Term disability is only available to non-hourly warehouse employees and is capped at 60% of salary.

### 401(k) Savings Plan

The 401(k) Plan is through ADP Retirement Services.  All employees are eligible for the plan after one year of service. The plan is a "Safe harbor" plan whereby all the Debtor matches vest

immediately.  The Debtor matches a maximum of 4% of an employee's salary, depending upon each employee's voluntary contribution percentage.  If an eligible employee does not contribute to the plan, there is no match.  Maximum employee and employer contributions are subject to IRS guidelines.

**Vacation /  Holidays / Sick Days**

Employees are generally subdivided into two categories:  Hourly warehouse and All Other.  All employees, regardless of category, receive the same 9 paid holidays per year.

Hourly warehouse employees are eligible for 7, 10, 12 & 15 days vacation after 1, 3, 10 & 15 years of employment.  All vacation is earned and must be taken in the current year unless approved by management.  All hourly warehouse employees are entitled to 1 personal day each year.

All Other employees are eligible for 6, 10, 15 & 20 days vacation after 1, 3, 5, & 10 years of employment (unless otherwise noted in their offer letter). All vacation is earned and must be taken in the current year unless approved by the senior management.  Non hourly warehouse employees earn 5 sick days per year with a maximum of 5 days carryover per year.