**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | § | **Case No. 09-51928-705** |
| | § | |
| **Whitney Design, Inc.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

**MEMORANDUM OPINION IN SUPPORT OF
<u>ORDER GRANTING THE AMENDED MOTION TO SELL</u>**

On November 21, 2009 (the "Petition Date"), the Debtor filed a petition for relief [Docket #1] pursuant to chapter 11 of title 11 of the United States Code,[1] thereby commencing the above-referenced bankruptcy case (the "Case"). On November 25, 2009, the Debtor filed a motion seeking authority to sell substantially all its assets pursuant to § 363 (the "Motion to Sell") [Docket #31]. On January 8, 2010, the Department of Commerce (the "DOC"), a creditor in the Case, filed an Objection to the Motion to Sell (the "Objection") [Docket #66].[2] On January 13, 2010, the Debtor filed a Memorandum in Support of the Motion to Sell (the "Memorandum") [Docket #71] and a Response to the Objection (the "Response") [Docket #72]. On January 14, 2010, the Motion to Sell and the Objection came for hearing upon notice (the "Hearing"). The Debtor sought

---

[1] Hereinafter, any reference to "section[s]" or "§[§]" refers to the indicated section(s) of the Bankruptcy Code.

[2] Another creditor, Bajer Design & Marketing, Inc., also filed an objection [Docket #65] to the Motion to Sell. That objection, however, was resolved by the parties, and the terms of that resolution have been integrated during the revisions of the asset purchase agreement. The Court deems that objection withdrawn. Home Products International, Inc. ("HPI"), a competitor of the Debtor which had been involved in the process of seeking federal anti-dumping duties determinations against the Debtor, had filed an objection that was heard and overruled as premature at the hearing on the motion to approve auction and bidding procedures. HPI did not file an objection to the Motion to Sell to be heard at the Hearing, but did orally join in the DOC's Objection.

approval of the sale as set forth in an asset purchase agreement with Household Essentials, Inc. ("Household Essentials"), and, in connection with the sale, the assignment of certain executory contracts.  At the conclusion of the Hearing, the Court ordered from the bench that the Motion to Sell be granted and that the Objection be overruled, and advised that a written order consistent with the bench ruling would issue at the Court's earliest convenience.  However, on January 19, 2010, prior to the entry of such order, the Court *sua sponte* reconsidered its ruling on one of the DOC's objection grounds—specifically, the objection to the asset purchase agreement's inclusion of the estate's avoidance actions among the assets to be sold.  The Court entered an Order Sustaining in Part the Objection [Docket #82], sustaining the Objection on this ground.  In that order, the Court allowed the Debtor to file an amended motion to sell and a revised asset purchase agreement for the Court's immediate consideration.  The Debtor filed such documents.[3]

Upon consideration of the pleadings and papers filed, the arguments made therein and at the Hearing, and the applicable law and the evidence offered, the Court makes the following findings of fact and conclusions of law, and concludes that it is proper to grant the Amended Motion to Sell, approve the

---

[3] On January 21, 2010, the Debtor filed an amended motion to sell (the "Amended Motion to Sell") [Docket #83].  Over the course of the next several days, the Debtor also filed several revised asset purchase agreements, each making minor but necessary revisions to the asset purchase agreement, to be consistent with the representations made by the Debtor at the Hearing and the language of the Bankruptcy Code.  The final revised asset purchase agreement was filed on January 28, 2010 (the "APA," as fully amended).  The Court now considers the Amended Motion to Sell and the APA.

APA, as fully amended, and overrule the remaining grounds in the Objection, for the reasons set forth herein.

## I. BACKGROUND

### A. Overview of the Debtor.

The Debtor is a Delaware corporation located in Hazelwood, Missouri. It distributes household goods imported primarily from vendors in China. The company was formed in 1994 as a wholly owned subsidiary of Tricor Consumer Products, Inc., which in turn is owned by principal shareholders James L. Glenn and Mark J. Brown. With forty-six employees and over a dozen independent contractors, the Debtor grosses roughly $40 million annually.

### B. The Debtor's Prepetition Secured Debt.

As of the Petition Date, the Debtor had two secured creditors: Enterprise Bank & Trust ("Enterprise"), and Eagle Fund I, L.P. ("Eagle Fund"). Enterprise also is the postpetition lender to the Debtor.

In May 2008, the Debtor entered into an agreement with Enterprise, pursuant to which Enterprise extended a $7.5 million revolver to the Debtor. The loan is secured by a valid, perfected security interest and blanket lien in the Debtor's personal property and its proceeds. As of the Petition Date, the Debtor owed to Enterprise over $5.2 million.

In January 2006, the Debtor entered into a loan agreement with Eagle Fund that included a $1.5 million note and a warrant purchase agreement. The loan is secured by a valid, perfected security interest and blanket lien in the Debtor's personal property and its proceeds. As of the Petition Date, the Debtor

owed to Eagle Fund over $2.8 million. Pursuant to a May 2008 subordination agreement, the Eagle Fund security interests and lien are junior to the security interests and lien of Enterprise.

### C.  The Debtor's Prepetition Anti-Dumping Liabilities.

The Debtor filed its chapter 11 petition in the face of "anti-dumping" liabilities imposed by the DOC resulting from the Debtor's involvement between 2004 and 2009 in the distribution of Chinese-manufactured floor-standing, steel-topped ("FS/ST") ironing boards.

### 1.  Overview of Federal Anti-Dumping Law.

Federal law seeks to protect U.S. businesses from unfair competition that results from certain pricing strategies utilized by foreign goods suppliers and from subsidies given to foreign suppliers by their governments.  One type of such unfair domestic competition is "dumping," which occurs when a foreign goods producer "dumps" its goods onto the U.S. market through a U.S. distributor at a price below the sales price of such goods in the producer's own country or at a price lower than the production cost.  19 U.S.C. § 1677(34).  The difference, "[t]he amount by which the normal value exceeds the export price" of the subject goods, is referred to as the "dumping margin."  19 U.S.C. § 1677(35).  To eliminate the dumping margin advantage, anti-dumping duties are assessed against the U.S. importer of the violating goods.  The duties are designed to be equivalent to the dumping margin.  19 U.S.C. § 1671e.

## 2. How Anti-Dumping Duties are Assessed.

The imposition of anti-dumping duties is affected by a multi-stepped process. First, before the importation of foreign goods subject to anti-dumping duties is permitted, the U.S. importer must file documentation (an "Entry") with U.S. Customs and Border Protection ("Customs") of the U.S. Department of Homeland Security.[4] The Entry allows Customs to estimate the appropriate anti-dumping duty (the "Estimated Duty"). The amount of the Estimated Duty is unique to the foreign supplier, and can range from a zero-percent duty to a maximum duty of 157.68% of the purchase price. Once the Estimated Duty is assessed, that amount must be placed on deposit by the U.S. importer (not by the foreign supplier) with Customs prior to importation of the subject goods.

Next, Customs conducts a "Liquidation of Entry," a retroactive review of the Entry to determine whether the amount of the Estimated Duty correctly reflects the actual duty due. This liquidation process may include an audit of the foreign supplier. As a result of the Liquidation of Entry, Customs may reassess the amount of the anti-dumping duties owed, adjusting the Estimated Duty and imposing a final ascertainment of the duty (the "Liquidated Duty"). Customs then may collect additional duties due or refund excess duty amounts. The result of a Liquidation of Entry may be appealed to the Court of International Trade.

### 3. Assessment of Anti-Dumping Duties Against the Debtor.

Beginning in 2004, the Debtor's importations of FS/ST ironing boards from China became subject to a claim of liability for anti-dumping duties. Between

---

[4] The DOC instructs Customs to assess such duties.

2004 and 2009—for five years—the Debtor imported FS/ST ironing boards from its Chinese supplier, Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware"). For the first two one-year annual review periods (February 2004 – July 2005 and August 2005 – July 2006), the Estimated Duties assessed by Customs for the Debtor's importations were $852,000.00. After the Liquidations of Entry for these two annual review periods, Customs assessed the Liquidated Duties at zero. However, HPI, a competitor of the Debtor that domestically produces FS/ST ironing boards, appealed the Liquidations of Entry. Those appeals to the Court of International Trade remain pending.

Despite the favorable results from the Liquidations of Entry for the first two annual review periods, though, the third annual review period (August 2006 – July 2007) presented crippling complications for the Debtor. The Estimated Duty for this period was set at 9.47%. However, the maximum 157.68% duty was imposed after Since Hardware failed to cooperate with the audit and its books and records raised issues during the Liquidation of Entry.[5] Since Hardware currently is appealing this duty determination.[6]

---

[5] There is no allegation that the Debtor was complicit in the noncompliance of Since Hardware. The imposition of the 157.68% rate upon the Debtor is the result of the Debtor being on the losing end of a business risk it chose to assume. Because the domestic importer is liable for anti-dumping duties, the Debtor risked being saddled with a high duty rate if Since Hardware chose to be uncooperative with Customs.

[6] At the Hearing, the DOC pointed out that the Debtor has been paying the litigation costs associated with Since Hardware's appeal. There is nothing untoward about the Debtor's wallet-commitment to the appeal. The party with standing to appeal, Since Hardware, has no dog in the fight as compared to the Debtor, because federal law does not impose the anti-dumping duty on Since Hardware. It is the Debtor that bears the burden of the 157.68% duty. The

After the imposition in March 2009 of the 157.68% duty for the third annual review period, the Debtor stopped purchasing from Since Hardware. However, by that time, another two annual review periods—the fourth period (August 2007 – July 2008) and the fifth period (August 2008 – July 2009)—had already occurred, with the Debtor having made purchases from Since Hardware throughout those final two periods (up through March 2009).[7] The Liquidations of Entry for these review periods have not yet been completed.

### 4. Impact of the Anti-Dumping Duties on the Debtor.

With the appeals of the Liquidated Duties for the first, second and third review periods ongoing, and with the prospect of heavy duties imposed for the fourth and fifth review periods, by late 2009 the Debtor was looking at substantial, potential duties and major litigation expenses. Moreover, as a result of the anti-dumping issues, the Debtor's other Chinese suppliers retracted or terminated trade credit to the Debtor, forcing the Debtor into cash-on-the-barrel terms. In the meantime, the Debtor lost out on new business ventures, given its compromised liquidity and credit. With no options left for conducting business outside bankruptcy, the Debtor filed for chapter 11 relief. As of the Petition Date, the Debtor had $1.3 million in anti-dumping duties on deposit with Customs.

---

Debtor has an obvious business interest in ensuring that the appeal is thoroughly and properly prosecuted.
[7] Initially after ceasing business with Since Hardware, the Debtor imported FS/ST ironing boards from another Chinese supplier. However, after that supplier also ran into problems with the DOC, the Debtor exited the FS/ST ironing board distribution business altogether by October 2009.

## D. The Debtor's Proposed § 363 Sale.

As the Debtor made clear from the outset of the Case, it filed for bankruptcy relief to salvage an otherwise-viable business from its anti-dumping liabilities. While the Debtor has other unsecured creditors, the Debtor was forthright about its circumstances and its intention: the Case was initiated for the purpose of relieving the Debtor principally from its anti-dumping liabilities, as it is the effect of those liabilities, and not its other liabilities, that makes it impossible for the Debtor to proceed as a business outside bankruptcy. Specifically, the Debtor sought to transfer substantially all its assets, as a going concern, to a new party for consideration, as allowed under the Bankruptcy Code.

The Bankruptcy Code provides two ways for a chapter 11 debtor to transfer property. Pursuant to § 363, the debtor may sell assets "free and clear" of interests in that property. Or, pursuant to § 1123, the debtor may sell property pursuant to a chapter 11 plan. Selling assets pursuant to the § 363 approval process generally is faster than disposing of assets through the plan confirmation process. But, because the § 363 sale process lacks the time, voting, and disclosure protections afforded by the plan confirmation process, a proposed § 363 sale is subject to numerous requirements to establish that the sale is proper.

From the genesis of the Case, the Debtor sought to sell its assets pursuant to § 363, and not through a plan. Four days after the Petition Date, the Debtor filed its Motion to Sell. Household Essentials, an entity owned by Messrs. Glenn and Brown (who are also the principals of the Debtor) and which was

created for the purpose of acquiring the Debtor's assets, made the stalking horse offer.

On December 4, 2009, the Debtor obtained an order approving the proposed bidding and auction procedures [Docket #45]. Then, over the course of the next five weeks, the process of marketing the assets and advertising the auction was undertaken—not by the clearly self-interested Messrs. Glenn and Brown—but by Mr. Brent Baxter, the independent chief sales officer of the Debtor. Ultimately, however, no competing bids were submitted.

## II. ANALYSIS

### A. Overview of § 363 Sale Law

Section 363 provides "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). A § 363(b)(1) sale may include a portion of the estate assets or may be for substantially all the estate assets.

However, the § 363 sale process does not require the disclosure and voting processes afforded by the plan confirmation process. In the plan confirmation process, these protections are important to ensure that the plan serves the interests of the estate and its creditors, and gives affected parties time and a venue for evaluating the treatment they would receive under the proposed plan. Since the § 363 sale process does not have these statutory protections, the law requires that a debtor establish that a proposed § 363 sale satisfies certain requirements. The goal of these requirements is to prevent the debtor from abusing the bankruptcy process by using § 363 to profoundly affect the

estate and its creditors while avoiding the vetting and accountability that would be required to confirm a plan. Pursuant to *In re Channel One Communications, Inc.*, 117 B.R. 493 (Bankr. E.D. Mo. 1990), a debtor seeking to sell its assets pursuant to § 363 must show: (1) a sound business purpose for the sale without a disclosure statement and plan; (2) accurate and reasonable notice of the sale; (3) a fair and reasonable sale price; and (4) that the sale that does not unfairly benefit insiders or the prospective purchasers, or unfairly favor a creditor or class of creditors. *Id.* at 496. Moreover, a proposed § 363 sale must be closely scrutinized, with the movant bearing a "heightened burden" of proving the elements necessary for approval of the sale. *Id.* (citing *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)).

The DOC objected to the Motion to Sell[8] on numerous grounds. The Court will take up these objections in the order preferred by the Court and will address the DOC's objection under *Channel One* after it addresses the other objections.

### B. The DOC's Objection Pursuant to the "Holder of a Secured Claim" Requirement of § 363(k).

Section 363(k) provides:

> [a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

---

[8] The Objection applies equally to the Amended Motion to Sell, the motion that the Court now considers.

11 U.S.C. § 363(k).  Thus, a secured creditor with an allowed claim is permitted to "credit bid"—or, include as consideration in its bid the value of its allowed secured claim—in its offer for the property securing his interest.

The DOC objects to approval of the sale because, it alleges, Household Essentials is not qualified to make a credit bid offer.  The DOC argues that because the sale is not conveying property that secures an allowed claim held by Household Essentials, Household Essentials is not a "holder" permitted to credit bid under § 363(k).

Although Household Essentials is the named bidder, it is not bidding on its own behalf. It is acting by proxy on behalf of Enterprise and Eagle Fund, asserting those entities' uncontested credit bidding rights pursuant to a Credit Bidding Proxy executed among and between those parties.  The DOC does not contest the legal effectiveness of the Credit Bidding Proxy.  It contests only the premise that the proxy conveyed by the Credit Bidding Proxy qualifies Household Essentials to be a "holder" under § 363(k).

Federal Rule of Bankruptcy Procedure ("Rule") 9010(a) provides that a creditor may "(1) appear in a case under the Code and act in the entity's behalf . . . and (2) perform any act not constituting the practice of law, by an authorized agent, attorney in fact, or proxy."  Accordingly, a creditor may act by proxy, so long as in doing so, the agent by proxy is not practicing law.  Asserting one's right to credit bid constitutes an "act," and it is not an "act" that constitutes the practice of law.  Therefore, under Rule 9010(a), a creditor may assert its credit bidding right by proxy.

There is no reason in law or at equity to exclude the act of credit bidding from the type of act permitted by proxy. First, allowing the act of credit bidding to be done by proxy is consistent with the plain language of Rule 9010(a)(2). Second, this application of Rule 9010(a)(2) does not create a new right to credit bid. It simply allows the exercise of an already-existing right through a third-party. Third, public policy is not abused. Allowing credit bidding by proxy does not chill the bidding process, and the estate and all parties are left in the same position as if Enterprise or Eagle Fund had been the direct credit bidder.

Accordingly, the Court **FINDS** that Household Essentials may credit bid by proxy and **HOLDS** that it is proper to overrule the DOC's objection pursuant to § 363(k).

### C. The DOC's Objection Pursuant to the "Property of the Estate" Requirement of § 363(b)(1).

It is axiomatic and statutorily clear that a trustee cannot be empowered under § 363(b)(1) to sell property that is not property of the estate. The DOC objects to the sale on the ground that it would convey property that is not property of the estate. Specifically, the DOC alleges that the Debtor is seeking to convey the $1.3 million in duty deposits held by Customs, which the DOC argues are not property of the estate. The Debtor in its papers argues, among other things, that these deposits in fact are property of the estate. The Court, however, does not need to reach the issue of whether the deposits are property of the estate because the Debtor is not seeking to convey the deposits pursuant to the proposed sale. The Debtor seeks to convey only the estate's *interest in any refund* to the $1.3 million in duty deposits upon resolution of the Liquidation of

Entry disputes.[9]   A debtor's interest in an anticipated refund attributable to prepetition events is property of the estate. *See Benn v. Cole (In re Benn)*, 491 F.3d 811, 813 (8th Cir. 2007).

Accordingly, the Court **FINDS** that the Debtor's anti-dumping deposits held by Customs are not property to be sold pursuant to the sale and **HOLDS** that it is proper to overrule as moot the DOC's objection pursuant to the "property of the estate" requirement under § 363(b)(1).

### D.  The DOC's Objection to the Sale Transferring "Free and Clear" Pursuant to § 363(f).

Section 363(f) provides:

> [t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property
>      free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to
>      be sold is greater than the aggregate value of all liens on such
>      property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable
>      proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  As § 363(f) is written in the disjunctive, only one of the five contingencies must be satisfied to allow the trustee to sell property "free and clear" of interests in such property.

### 1.  The DOC's Anti-Dumping Claims.

In its Memorandum, the Debtor asserts that the sale should be permitted because § 363(f) allows it to sell the assets free and clear of the DOC's anti-

---

[9] The Debtor represented this fact at the Hearing.  The APA makes clear that the deposits are not included among the property to be sold.

dumping *claims* because those *claims* are in bona fide dispute. The Debtor's conclusion is correct—the sale should be permitted pursuant to § 363(f)—but its argument for that conclusion is not.

Section 363(f), by its terms, allows the sale of property free and clear of *interests* in that property. It does not permit the sale of property free and clear of "claims." A "claim" and an "interest" generally are not synonymous—holding a claim against the estate does not necessarily equate to holding an interest in the specific property of the estate subject to sale. *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581-82 (4th Cir. 1996)(holding that the term "interest" should not be interpreted so sweepingly as to encompass a general claim against the estate, but not so narrowly as to refer only to an in rem interest in property, such as a lien); *In re Lawrence United Corp.*, 221 B.R. 661, 668-69 (Bankr. N.D.N.Y 1998) (providing a lengthy recounting of case law defining an "interest" in property for purposes of § 363(f), and concluding that "interests" are "obligations that are connected to, or arise from, the property being sold"); *Fairchild Aircraft Inc. v. Cambell (In re Fairchild Aircraft Corp.)*, 184 B.R. 910, 917-18 (Bankr. W.D. Tex. 1995) (although adopting the less common definition that limits "interests" to in rem interests only, also providing compelling and thorough reasoning as to why the term "interest" does not include general unsecured claims).[10]   While an

---

[10] *But see In re Creative Restaurant Mgmt., Inc.*, 141 B.R. 173, 178 (Bankr. W.D. Mo. 1992) (holding, without citation, that "a creditor, even an unsecured one, has an interest in property of the debtor . . . . The right to look to estate property for satisfaction of the debt creates an interest in property within the meaning of [§]

interest (such as, but not limited to, a lien) may secure a claim by granting the interest holder a right to satisfaction in the property securing the interest, a claim alone in general does not create an interest in any particular property. A claim, if allowed, establishes only the right of the claim holder to a distribution from the estate according to the statutory priority scheme. The notion that a debtor may sell property "free and clear" of *claims* pursuant to § 363(f) is an incorrect statement of the law.

Therefore, the sale should be permitted despite the DOC's anti-dumping claims not because the claims are subject to bona fide disputes,[11] but because the DOC has no interest in the property to be sold by virtue of its anti-dumping claims.[12] As the DOC readily admits—and, in fact, makes a point of stating—it holds only unsecured claims for the anti-dumping liabilities. Such claims are merely claims against the estate and a distribution therefrom as permitted by the Bankruptcy Code; they are not "interests" in the specific estate property to be sold. There is no basis for an objection to the sale under § 363(f) related to the anti-dumping claims.

---

363(f)"). However, this opinion was later vacated, 150 B.R. 232 (Bankr. W.D. Tex. 1992), and holds no precedential value.

[11] That is, the fact that the claims are subject to bona fide disputes is a red herring for purposes of determining whether the property may be sold free and clear of the anti-dumping claims.

[12] The DOC's claims, if allowed, may entitle it to a distribution from the estate, if there is a distribution to unsecured creditors. And, unlike other unsecured creditors, the DOC may have some additional satisfaction, as it will be able to retain any non-refunded amounts of the $1.3 million on deposit transferred to the DOC prepetition. But the deposit is not an interest in the property to be sold.

## 2. The DOC's Successor Liability Claims.

Even with the DOC's admission that it does not hold a secured interest in the property to be sold, there is one additional § 363(f) issue to address. The Debtor also argues in its papers that the property may be sold free and clear of any *successor liability* claims of the DOC (which is interesting, since the DOC did not address this in the Objection). However, the issue of successor liability was brought up at the Hearing. Given this, the Court will read the DOC's § 363(f) objection to include an objection to the sale of the property free and clear of any successor liability claims that the DOC may have.

Some case law suggests that a successor liability claim may be an "interest" in property for purposes of § 363(f). The general reasoning is that, even if unsecured, a successor liability claim "follows" the property, even though it does not attach to the property as would a lien. *See, e.g., In re General Motors Corp.*, 407 B.R. 463, 503-04 (Bankr. S.D.N.Y. 2009)(providing an extensive discussion of the definition of "interest" for the purpose of § 363(f) and noting that a textual analysis of the statute does not "support or foreclose the idea that an 'interest' is a right that travels with the property—or that it would do so unless the Code cut it off," and ultimately treating a successor liability claim as an "interest" under § 363(f)). The Court will assume for purposes of this Case that an "interest" for the purpose of § 363(f) may be read broadly enough to include a successor liability claim.

However, even if the DOC holds such successor liability claims and those claims are "interests" in the property to be sold, the Debtor still may transfer the

property free and clear because those claims are in bona fide dispute. A claim for successor liability does not give the claimholder greater rights against the successor than the claimholder would have had against the predecessor. It merely preserves the status quo of the holder's rights so that they may be asserted against the successor. Therefore, because DOC's anti-dumping claims are subject to bona fide disputes, any successor liability claims the DOC might hold also would be subject to bona fide disputes. As such, pursuant to § 363(f)(4), the Debtor may sell the property free and clear of any interest the DOC may have in the property by virtue of any successor liability claims because any such interest arising from these claims is subject to bona fide disputes.[13]

Accordingly, the Court **FINDS** that the DOC does not hold an interest in the property to be sold by virtue of its anti-dumping claims. Further, the Court **FINDS** that the DOC may hold an interest in the property by virtue of successor liability claims, but that any such interest is subject to bona fide disputes. Therefore, the Court **HOLDS** that it is proper to overrule the DOC's objection pursuant to § 363(f).

### E. The DOC's Objection Pursuant the "Adequate Protection" Requirement of § 363(e).

Section 363(e) provides: "[o]n request of an entity that has an interest in property . . . proposed to be . . . sold . . . the court . . . shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). This subsection is intended to protect

---

[13] Likewise, the property may be sold free and clear of any derivative claim for anti-dumping or successor liability claims that HPI may have against the Debtor or its successor (pursuant to the Byrd Amendment or any other authority).

secured creditors from depreciation of their collateral while the trustee operates the debtor's business. *In re Sweetwater*, 40 BR. 733, 742 (Bankr. D. Utah 1984). As such, case law has held that § 363(e) generally does not protect unsecured creditors, but requires that a creditor seeking adequate protection either hold a claim secured by the property to be sold, or be a lessor compelled to perform pursuant to the Bankruptcy Code. *In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 326 (Bankr. N.D.N.Y. 1995)(discussing case law).

Further, adequate protection protects an entity against "a decrease in the value of such entity's interest in [the property to be sold]." 11 U.S.C. § 361(1) & (2). Therefore, an entity can be entitled to adequate protection only if that entity (1) holds an interest in the property, and (2) that interest has a value that can be decreased. Therefore, (1) if a creditor holds no interest in the property, it cannot suffer a loss of value in such a nonexistent interest, and thus such creditor is not entitled to adequate protection, and (2) if a creditor in fact holds an interest but that interest has merely speculative value, there can be no decrease in the value of an interest, and thus such creditor also is not entitled to adequate protection.

The DOC's argument of entitlement to adequate protection fails as to both its anti-dumping claims and as to any successor liability claims it may have. The DOC is not entitled to adequate protection of its anti-dumping claims because the DOC has no interest in the property to be sold by virtue of those claims (as discussed in Part II.D.1). And the DOC is not entitled to adequate protection of any successor liability claims it may hold—even if they constitute an "interest in the property" (as discussed at Part II.D.2)—because those claims would not

suffer a loss in value as a result of the sale, as statutorily required for entitlement to adequate protection. A successor liability claim creates only the right for the claimholder to pursue the successor to the property for satisfaction; it does not provide a liquidation value until the claim has been fully adjudicated. Adequate protection, however, is a mathematical concept, calculated based on the known value of a creditor's interest in the property. If the value of an interest in property is "unknown"—as any successor liability claims of the DOC would be—it is not possible to calculate adequate protection. One cannot subtract from an unknown value to calculate a decrease in that unknown value. Any attempt to calculate adequate protection of an unknown value would rely on purely speculative numbers for the algebra, would arrive at a purely speculative result, and would be fraught with potential for abuse in estimation. Therefore, because the Debtor's proposed sale cannot result in a calculable decrease in the value of any sucesssor liability claims, the DOC is not entitled to adequate protection of any interest it may have in the property to be sold.

Accordingly, the Court **FINDS** that the DOC is not entitled to adequate protection for any claims it holds or may hold, and **HOLDS** that it is proper to overrule the DOC's objection pursuant to § 363(e).

### F. The DOC's Objection to a Finding of Good Faith.

The DOC objects to the sale based on the allegation that the sale is not in "good faith." A § 363 sale must be in good faith, both pursuant to the statute and case law.

Section 363(m) provides:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). As the Eighth Circuit explained, "[§] 363(m) prevents a modification or reversal of a bankruptcy court's order authorizing the sale of the debtor's assets from affecting the validity of the sale." *Official Committee of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.)*, 328 F.3d 1003, (8th Cir. 2003)(discussing the purpose and operation of § 363(m)). Moreover, it is widely understood that a finding of good faith, although not a statutory element of § 363(b), is required for a sale pursuant to § 363(b) as a practical matter. *In re Nicole Energy Servs.*, *Inc.*, 385 B.R. 201, 235 (Bankr. S.D. Ohio 2008)(citing numerous cases); *Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002)(noting that "no bankruptcy judge is likely to approve a sale that does not appear to be in 'good faith.'"). As such, a finding of good faith is an integral part of a § 363 sale. And, without it, there would be considerably less protection offered to the purchaser (which, in turn, most likely would result in a depression of the sale price).

A lack of "good faith" in a § 363 sale is shown by "misconduct surrounding the sale," *Badami v. Burgess (In re Burgess)*, 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000). And, "[t]ypically, the requisite misconduct necessary to establish a lack of good faith involves 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Id.*

(citing *In re Rock Indus. Machine Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978), and *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996)). The DOC does not allege any such misconduct, fraud, or collusion on the part of the Debtor or Household Essentials or any other entity. There is no allegation that anyone attempted to take unfair advantage of or manipulate any bidders or potential bidders. Rather, the DOC's allegation of a lack of good faith rests on the fact that the Debtor indisputably filed for bankruptcy in order to obtain relief principally from its liabilities to the DOC—and had a business plan going into the bankruptcy case as to how it could legally preserve the value of the business through a § 363 sale. This understandably offends the DOC because—in blunt terms—the DOC feels like it is getting a raw deal.

But, despite the offense taken by the DOC, the DOC is not getting any more of a raw deal by this sale than is any other unsecured creditor. The DOC complains that this is a misleading observation because, as a practical matter, the DOC is situated differently than other unsecured creditors. The DOC notes that many of the other unsecured creditors are trade vendors who received preferential transfers before the Debtor filed for relief, and who will do business with Household Essentials following the sale. Thus, these unsecured creditors, the DOC argues, are not receiving (or, at least, they do not feel they are receiving) a raw deal—which accounts for why no other creditors object. In short, according to the DOC, this sale is really an orchestrated plan to make everyone happy except the DOC, and as such, is in bad faith.

However, despite these accusations, the DOC still has not shown any collusion, fraud, or other such misconduct that precludes a finding of good faith. At most, it as shown only that the outcome of a misconduct-free sale makes the DOC less happy than it makes other unsecured creditors. Additionally, the DOC misfires with its conspiratorial suggestions regarding this sale. While the Debtor filed for bankruptcy primarily to obtain relief from the potential unliquidated DOC liabilities (although it had other creditors, as well), nothing about the sale treats the DOC unfairly as compared to other unsecured creditors. In point of fact, the Court disallowed the conveyance of the avoidance actions in this sale, and Household Essentials still agreed to make the purchase of the remaining assets. As such, any preferential transfer actions against prepetition trade vendor creditors remain available to the estate. To the degree that these actions are not protected by a statutory defense and would be financially feasible to prosecute, the trade vendor creditors remain subject to liability. And the Debtor remains under a fiduciary obligation to administer the estate's assets, including the avoidance actions, as required by law. As such, other unsecured creditors that could be "on the hook" to the estate have been left dangling on that hook. The DOC is not the only unsecured creditor that could end up unhappy. Further, the sale is not an impermissible *sub rosa* plan. The sale proceeds will be distributed pursuant to the priority scheme in the Bankruptcy Code and the sale will not alter any creditor's right to distribution.

At the end of the day, the good faith objection boils down to the DOC's frustration. Many of the trade vendor creditors are happy about the prospect of

doing business with Household Essentials, while the DOC clearly has no such opportunity. The DOC's purpose is not to make a commercial profit; it is to enforce the law. However, the existence of a post-bankruptcy business opportunity available only to trade vendor creditors in the private sector does not equate to a lack of good faith in the sale.

As such, the Court **FINDS** that Household Essentials and the Debtor both have acted and are acting in good faith related to the sale and that Household Essentials is a purchaser in good faith for purposes of § 363(m), and **HOLDS** it is proper to overrule the DOC's objection on good faith grounds.

### G. The DOC's Objection Based on Public Policy.

The DOC suggests that allowing this sale is improper because it undermines the Congressional purpose of protecting domestic U.S. businesses from unfair pricing and competition. However, the Court is faced with two competing federal public policies: the policy of protecting against dumping versus the policy of providing the debtor bankruptcy relief. This is not a matter of conflicting statutory language. Section 363 permits the contemplated sale, and there is no special treatment for anti-dumping claims under the Bankruptcy Code. If Congress intended the policy concerns involved with anti-dumping to trump the policy concerns in bankruptcy law, it could have written the law to provide the DOC with special protections in bankruptcy. But it did not, and bankruptcy law

permits exactly what is proposed. The sale is not contrary to public policy; it is simply contrary to the primacy of anti-dumping policy.[14]

Accordingly, the Court **FINDS** that public policy is not violated by the proposed § 363 sale and **HOLDS** that it is proper to overrule the DOC's objection on this ground.

### H. The DOJ's Objection to the Sale Related to *Channel One*.

As stated in Part II.A, under *Channel One*, a proposed § 363 sale is closely scrutinized, with the party seeking approval bearing a heightened burden of showing: (1) a sound business purpose for the sale without a disclosure statement and plan; (2) accurate and reasonable notice of the sale; (3) a fair and reasonable sale price; and (4) that the sale does not unfairly benefit insiders or the prospective purchasers, or unfairly favor a creditor or class of creditors. The DOC objects to the sale based on an alleged failure of the Debtor to meet its burden on these elements. The DOC also objects to the application of *Channel One* as the most appropriate, current precedent for this Court to follow. The Court will address the objection to the application of *Channel One* first, then turn to the objection based on an alleged failure to satisfy *Channel One*.

### 1. The DOC's Objection to the Application of *Channel One* as the Appropriate Precedent.

*Channel One* is the long-standing precedent in this district setting forth the standard for determining whether to approve a § 363 sale. However, in its

---

[14] The DOC already has succeeded in its public policy purpose in one regard—merely by imposing the liabilities. The Debtor has stopped importing FS/ST ironing boards and Household Essentials does not intend to wade into this industry. The DOC has stopped the "dumping," going forward.

Objection, the DOC repeatedly cites to *In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009), in support of its underlying theme that the proposed sale is not proper. At the Hearing, the DOC argued that *Channel One* is outdated and fails to reflect the past two decades of development in § 363 law. The DOC points to *Gulf Coast* as a better case for setting forth the appropriate standard for determining whether to approve a § 363 sale. Because most of the DOC's authority and argument rests on *Gulf Coast*, the Court will address the issue of whether *Gulf Coast* should be applied.

In *Gulf Coast*, the chapter 11 debtors sought to sell substantially all assets pursuant to a § 363 sale, and to assign numerous executory contracts important to sustaining the value of the conveyed assets. The court, however, determined that the debtors had not "demonstrated a substantial business reason for the § 363 sale in preference to a sale under a liquidating chapter 11 plan," *id.* at 411, and denied the motion.

The court carefully outlines more than a decade's worth of § 363 law in the Fifth Circuit, culminating in the all-too-true observation that "[c]orporate reorganizations have all but disappeared," *id.* at 419—a result of the ever-increasing use of § 363 sales to convey estate assets, instead of seeing the case through the plan process. *Gulf Coast* presents the question: should bankruptcy law so commonly permit so-called "creditor in possession cases" and welcome the use of a § 363 sale in substitution for the plan confirmation process? In fact, *Gulf Coast* explicitly implores the appellate court for guidance, noting that "[i]t would be very helpful if the Fifth Circuit were to take another look at the

boundaries of § 363(b) sales to provide more guidance to the bankruptcy courts in the circuit." *Id.* at 422.

However, *Gulf Coast* and its observations do not undermine the propriety of allowing the § 363 sale in this case, on these facts. *Gulf Coast* is distinguishable from this Case. First, *Gulf Coast* involved analyzing whether there was a sound business reason for the § 363 sale in preference to a sale under a liquidating chapter 11 plan. *Id.* at 411 & 415 (noting that "[t]he Bankruptcy Code does not provide any explicit guidance to determine when § 363(b) is the appropriate procedure and when *§ 1123* is the appropriate procedure" (emphasis added)). Here, by contrast, the relevant comparison is whether there is a sound business reason for the sale in preference to a liquidation under *chapter 7.* As of February 1, 2010, the Debtor will no longer have a postpetition lending facility and cannot continue operations. Therefore, because there is insufficient time to proceed through the chapter 11 plan process, the choice for the Debtor is: sell the assets in a § 363 sale or proceed to conversion to chapter 7, where the going concern value will collapse and the assets will either be subject to foreclosure or a chapter 7 liquidation at a significantly reduced price.

In *Gulf Coast*, there was no evidence "that any value w[ould] be lost through delay to permit plan confirmation." *Id.* at 427-28. Here, there is ample evidence that neither a chapter 11 plan of reorganization nor a chapter 11 plan of liquidation can occur, and that value would be lost if the Debtor was required to proceed through a chapter 7 plan of liquidation. Moreover, *Gulf Coast*

specifically left open the possibility that "a need for speed" in some circumstances may justify a § 363 sale, such as where there is "the need for a quick sale to avoid adverse, but looming, market or business conditions." *Id.* at 423. The *Gulf Coast* court determined that there was no such need for speed in that case, but the business conditions and realities at play in this Case suggest that there is such a need for speed. Here, the Debtor has shown (as *Gulf Coast* requires) "that there is a need to sell prior to [a] plan confirmation hearing." *Id.* at 428.

Further, in *Gulf Coast*, the sale would have denuded the estate of all its assets, leaving the debtor with "only two possibilities . . . dismissal of the bankruptcy case or converting the case to chapter 7 as a no-asset case." *Id.* at 414. Here, the estate will retain, among other things, the avoidance actions. Therefore, the post-sale treatment of this Case is not so preordained. The Court expects that the Debtor to file a chapter 11 plan of liquidation. *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326, 2331 n.2 (2008) (noting that, when substantially all assets of a chapter 11 debtor are sold pursuant to § 363, the debtor "typically submits for confirmation a plan of liquidation . . . providing for the distribution of the proceeds resulting from the sale."). Although the sale will not inject cash into the estate, it preserves the avoidance actions for liquidation.[15] Therefore, before dismissal will be permitted or chapter 7

---

[15] The Debtor is skeptical that the avoidance actions will provide any significant return because of the availability of statutory defenses. However, the DOC made it clear at the hearing that it believes these actions may hold significant value.

conversion allowed, the Debtor must show that dismissal or conversion would be appropriate, given the remaining assets in the estate.

The *Gulf Coast* court also questioned why

it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits. And if the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it would be especially difficult to understand why the purchaser should get the benefit of the extraordinary bankruptcy powers and remedies for which it did not pay.

*Id.* at 427. In this Case, though, many administrative expenses will be paid. As detailed at the Hearing, pursuant to the sale, Household Essentials will become obligated to satisfy numerous administrative expenses, including postpetition accounts payable, postpetition employee compensation, cure amounts for the assigned executory contracts, and allowed professional compensation—expenses which most likely would not be satisfied in full in a chapter 7 liquidation or if the § 363 sale were made to non-insiders. Given that the secured creditors are paying the administrative overhead to obtain the assets free and clear and no party is being improperly prejudiced by the secured creditors essentially "buying" the relief available under the Bankruptcy Code to preserve an otherwise-viable business and its employees' jobs, there is no abuse such in *Gulf Coast*. The secured creditors are not getting the sale for "free" or on the back of the estate.

The *Gulf Coast* court also noted that it "cannot make the determination that the entities in control of the corporation did not have a conflict of interests when they negotiated with [the potential buyer] regarding the APA." *Id.* at 428. This Court is not faced with the same potential indicator of a lack of good faith by

the seller and the purchaser. There was no evidence that the Debtor, represented by the independent Chief Sales Officer, and Household Essentials had conflicts of interest or that the offer was not the product of an arm's length negotiation.

Finally, in *Gulf Coast*, "some unsecured creditors will probably be paid and other will not be paid," as a result of the proposed sale, leading the court to hold that it could not "conclude that creditors with equal rights are treated alike." *Id.* Here, there is no such concern. The DOC will not be treated any differently than any other unsecured creditor as a result of the sale. None will receive any proceeds.

For these reasons, the Court **FINDS** no reason to deviate from applying *Channel One* in favor of *Gulf Coast* as the proper precedent for determining whether to approve the proposed § 363 sale, and **HOLDS** that it is proper to overrule the DOC's objection on this ground. In so ruling, the Court makes no suggestion on the persuasiveness of *Gulf Coast* in a case involving facts more similar to those in *Gulf Coast*.

### 2. The DOC's Objection Based on the Alleged Failure of the Debtor to Satisfy *Channel One* Elements.

#### a. A Sound Business Purpose.

The Debtor has shown a sound business purpose for selling its property in the proposed § 363 sale. Simply put, there is no other option that will preserve the going concern value of the assets. There is not a choice here between a § 363 sale and disposal of the property pursuant to a chapter 11 plan. The Debtor will run out of debtor in possession financing at the beginning of February, and its

lender will not extend additional postpetition lending. If the assets are not sold in the § 363 sale, the Debtor will go dark, its going concern value will be destroyed, and its assets will have to be sold pursuant to a liquidation or foreclosure. In addition, this sale will preserve most of the jobs at the Debtor—the employment of approximately forty people. These are sound business reasons for proceeding with this § 363 sale.

Even though this sale does not promote the business purpose of reorganization, not all chapter 11 cases have reorganization as their business purpose. The law permits chapter 11 to be utilized to promote the business purpose of liquidation (called, in the vernacular, a "liquidating 11"). As such, even if this sale generates a return only to the secured creditors and does not facilitate a reorganization, this does not necessarily make the sale devoid of a chapter 11 business purpose. The proposed sale will allow the Debtor to obtain bankruptcy relief without simultaneously destroying its own value and radically depreciating the secured creditors' collateral. Good policy would promote the use of § 363 to prevent the otherwise unavoidable catastrophic destruction of the Debtor's value and all the collateral damage (to creditors and employees alike) that would result. A sale such as this stands in sharp contrast to a § 363 sale that makes a return solely to the secured creditors, but where the debtor is not an operating business, has no going concern value, and has no employees. *Compare, e.g., In re Encore Healthcare Assocs.*, 312 B.R. 52, 57 (Bankr. E.D. Pa. 2004); *In re Rausch Manufacturing Co., Inc.*, 59 B.R. 501, 503 (Bankr. D. Minn. 1985)(distinguishing from other prominent cases involving the proposed

sale of substantially all assets under § 363, and explaining that this case "involves a debtor which is on the verge of dying and has absolutely no hope of rehabilitation . . . . This is not a case where the sale of substantially all of the assets result[s] in the demise of a debtor/corporation but rather is a sale to individuals or an entity which intends to continue the debtor as a viable company employing people and producing product . . .").

### b. Accurate and Reasonable Notice.

The Debtor provided notice of the proposed sale as follows.  By November 30, 2009, the Debtor had served upon the twenty largest creditors and other parties in interest the Motion to Sell, which included a description of the proposed sale to Household Essentials and made available a copy of the (original) APA upon request. By December 8, 2009, the Debtor had served upon the twenty largest creditors and other parties in interest the Court's order approving the bidding and auction procedures and setting the Motion to Sell for hearing.  As such, the served parties had more than a month's notice of the bidding deadline, and approximately five weeks' notice of the hearing on the Motion to Sell.  The DOC alleges that the *Channel One* element requiring accurate and reasonable notice was not satisfied, but offers no argument or explanation as to how the above-described notice was insufficient.

### c. A Fair and Reasonable Sale Price.

The proposed sale to Household Essentials would yield a purchase price in excess of $7 million.[16]   In the Declaration in Support of the Motion to Sell [Docket #70] and in testimony offered at the Hearing, Mr. Baxter explained how this purchase price would exceed both the liquidation value and the valuation calculated by the EBITDA Valuation Process, and made clear that in this heavily relationships-dependent industry, the price offered by Household Essentials most likely would exceed any price that could be obtained from an outsider.   In addition, he advised that keeping the assets on the market for a longer period of time will not produce a higher offer, but most likely will result in deterioration in the price, given the business realities that will be faced after January.

Mr. Baxter also detailed the marketing process by which competing bids were solicited.   Mr. Baxter's investment banking company, Clayton Capital Partners ("CCP"), which specializes in middle market acquisitions, used its professional expertise to conduct market research.   As is common in the industry, CCP has numerous databases with tens of thousands of contacts, which allows CCP to market to parties that might be interested in the proposed sale.   Before the Petition Date, CCP had begun targeting the most likely prospective buyers, including common industry buyers and private capital funds. Between November 23 and December 8, 2009, thousands of potential buyers,

---

[16] The DOC characterizes this return as effectively "valueless" because it is a credit bid, with no cash as part of the consideration.  A credit bid is not valueless, effectively or otherwise.   It is an offer to exchange something of value—the allowed secured claim or a part of it—for assets of the estate.

financial intermediaries, and referral sources were contacted by email with information about the sale. CCP held detailed and tailored conversations with at least thirty-eight prospective buyers, seventeen of which signed nondisclosure agreements that allowed them to review confidential financial information.

The DOC questioned whether Mr. Baxter, who holds a B.A. and an M.B.A., is qualified to offer expert testimony on the issue of the fairness and reasonableness of the proposed purchase price. The Debtor advised that Mr. Baxter was not being offered as an expert on accounting or valuation issues, but was called to offer testimony regarding his role in the bidding and sale process. The Court accepts Mr. Baxter's testimony as that of a layperson with twenty years' experience in investment banking and mergers and acquisitions. Mr. Baxter's testimony was not countered by testimony of an expert or another layperson. The Court finds Mr. Baxter's testimony to be credible and gives it considerable weight.

The DOC challenged the fairness and reasonableness of the price principally by questioning the valuation of the avoidance actions. The DOC argued that the value of the avoidance actions was underestimated, resulting in a sale price below the real value of the assets. However, because the Court sustained the DOC's objection to the inclusion of these avoidance actions as property to be sold, the value of these actions is no longer an issue in determining of the fairness and reasonableness of the price.

The DOC also suggested the assets were not sufficiently marketed to ensure that the sale would produce a fair and reasonable price. Although Mr.

Baxter's professional résumé clearly establishes his expertise in packaging asset sales such as this one, the DOC attacked Mr. Baxter's use of targeted informational emails. It characterized the (unfortunately termed) "email blasts" as nothing more than junk mail equivalents. This is not a convincing argument. It strikes the Court as common and reasonable for an asset marketing company to use its professional databases and the convenience of emails to target potential buyers. The DOC also attempted to show that the marketing was not done in enough time to allow for competing bids. However, the best that the DOC could produce in support of this theory was an informational letter sent by the Debtor to an affiliate of HPI in late December regarding the auction. This is not evidence of untimely or unaggressive marketing, as HPI had known about the proposed sale since the end of November.

### d. The Sale Does Not Unfairly Benefit Insiders or the Purchasers, or Unfairly Favor a Creditor or a Class of Creditors.

There is no doubt that the proposed sale benefits the insiders, Messrs. Glenn and Brown, and the secured creditors. However, the parties will not benefit *unfairly*. To the contrary, the property will be sold after a well-marketed bidding and sale process that resulted in a fair and reasonable price for the assets. As credit bidding is permitted under the Bankruptcy Code, the fact that there is not a return to the estate in the form of cash does not imply that any party unfairly benefited. There was no fraud, price collusion, bidding suppression, or a failure of disclosure related to the sale. The bidding and sale process was not so expedited that the sale was not thoroughly marketed. The Debtor's side of the sale was negotiated by Mr. Baxter, not the Messrs. Glenn

and Brown. There was no accusation that Mr. Baxter breached his fiduciary duty to the Debtor or any other indication that the offer was not an arm's length transaction. *See Apex Oil Co.*, 92 B.R. 847, 870 (Bankr. E.D. Mo. 1988) (holding that absent a violation of a fiduciary duty, there is nothing inherently wrong with an arm's length transaction that benefits both the estate and an insider). And the proposed sale does not alter any secured creditor's rights without its consent, and does not attempt to accomplish anything that could not be accomplished in a chapter 11 plan. *See In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990)(denying the debtor's motion to sell because, among other things, the sale unfairly benefited certain parties).

For these reasons, the Court **FINDS** that, under close scrutiny, the Debtor met its heightened burden under *Channel One* and **HOLDS** that it is proper to overrule the DOC's objection to the sale pursuant to *Channel One*.

### III. CONCLUSION

The Court **FINDS** all facts as set forth herein, including but not limited to: proper and sufficient notice of the bidding process and proposed sale was made upon all parties receiving service of the pleadings and orders related thereto; the proposed sale is for a sound business purpose; the sale price represents the highest and best offer for the assets, and is a fair and reasonable price reached pursuant to an arm's length negotiation and without misconduct; the proposed sale does not unfairly benefit or favor any party; the proposed sale is in good faith for all purposes of § 363, including but not limited to § 363(m); and sufficient grounds exist to waive the stay otherwise made effective pursuant to Rule

6004(h) and 6006(d). Therefore, the Court **HOLDS** that it is proper to grant the relief requested in the Amended Motion to Sell, subject to the Order Sustaining in Part the Objection, approve the APA, as fully amended, and overrule the remaining grounds in the Objection. Accordingly, the Court will issue an order granting such relief, as consistent with this Memorandum Opinion.

CHARLES E. RENDLEN, III
U.S. Bankruptcy Judge

DATED: January 29, 2010
St. Louis, Missouri
mtc

**Copy mailed to:**

David A. Warfield
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101