# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-51928 |
| | ) | |
| WHITNEY DESIGN, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | **DEBTOR'S REPORT OF CLOSING** |
| | ) | **OF SALE TRANSACTION** |
| | ) | |
| | ) | **David A. Warfield, #4642** |
| | ) | **Allison E. Graves, #5217003** |
| | ) | **THOMPSON COBURN LLP** |
| | ) | **One US Bank Plaza** |
| | ) | **St. Louis, MO 63101** |
| | ) | **(314) 552-6000 (Phone)** |
| | ) | **(314) 552-7000 (Fax)** |

Comes now Whitney Design, Inc., by its undersigned counsel, and reports that the

transactions set forth in the Amended and Restated Asset Purchase Agreement attached hereto

as *Exhibit A* were closed on Friday, January 28, 2010 at 6:37 p.m. Central Standard Time.

Respectfully submitted,

THOMPSON COBURN LLP

By____*/s/ David A. Warfield*_____
David A. Warfield, #4642
Allison E. Graves, #5217003
One US Bank Plaza
St. Louis, Missouri 63101
(314) 552-6015 (Phone)
(314)-552-7015 (Fax)

Attorneys for Debtor and Debtor-in-Possession

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and genuine copy of the foregoing was served electronically on this 1st day of February, 2010 on all parties on the Court's ECF notice list.

<u>/s/  David A. Warfield</u>

# EXHIBIT A

# THIRD AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

by and between

## HOUSEHOLD ESSENTIALS, LLC, as Buyer,

and

## WHITNEY DESIGN, INC., as Seller

January 28, 2010

<u>**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**</u>

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into effective as of January 28, 2009, by and between HOUSEHOLD ESSENTIALS, LLC, a Missouri limited liability company, or its assign(s) (the "<u>Buyer</u>"), and WHITNEY DESIGN, INC., a Delaware corporation (the "<u>Seller</u>").

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

1.1 <u>Definitions</u>. Unless otherwise defined herein, terms used herein shall have the meanings set forth on <u>Exhibit A</u> attached hereto and incorporated herein by this reference.

1.2 <u>Rules of Construction</u>. Unless the context otherwise clearly indicates, in this Agreement:

(a) the singular includes the plural;

(b) "includes" and "including" are not limiting;

(c) "may not" is prohibitive and not permissive; and

(d) "or" is not exclusive.

## ARTICLE II

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1 <u>Purchase and Sale of Assets</u>.

(a) Subject to the terms and conditions set forth in this Agreement, for the consideration specified in <u>Section 3.1</u>, at the Closing, Seller shall sell, contribute, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and take assignment and delivery of all properties, assets, rights, titles and interests of every kind and nature, owned, licensed or leased by Seller (including indirect and other forms of beneficial ownership) as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including all of the following assets (all of the assets to be sold, assigned, transferred and delivered to Buyer hereunder herein called the "<u>Acquired Assets</u>"), with such sale and purchase to be free and clear (except for the Assumed Obligations and Permitted Liens) of any interests in the Acquired Assets held by any entities other than the Seller or its estate, to the fullest extent permitted by Law and the Bankruptcy Code; <u>provided</u>, that the Acquired Assets shall not include the Excluded Assets retained by Seller pursuant to <u>Section 2.3</u> ):

(i) all billed and unbilled accounts, notes and credit card receivables (whether current or noncurrent) and all causes of action specifically pertaining to the collection of the foregoing;

(ii) all purchase orders not specifically excluded and related credit protections;

(iii) all promotional allowances and vendor rebates and similar items;

(iv) all Intellectual Property, along with all goodwill associated therewith and the business symbolized thereby, all income, royalties, products, proceeds, damages and payments due or payable to Seller as of the Closing or thereafter, including damages and payments for past, present or future infringements, misappropriations or other causes of actions thereof, the right to sue and recover for past infringements, misappropriations or other causes of actions thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world and all copies and tangible embodiments of any such Intellectual Property in Seller's possession or control;

(v) all of Seller's rights existing under the Assigned Contracts (for the avoidance of doubt, a list of such Assigned Contracts is set forth in Schedule 2.1(a)(v)), as determined by Buyer, to the extent that such Assigned Contracts (A) have been entered into after the petition for the Chapter 11 Case and assigned by Seller pursuant to documentation acceptable to Buyer, (B) have been assumed prior to the date of the Sale Order pursuant to an Order of the Bankruptcy Court and assigned by Seller to Buyer pursuant to the Sale Order or other Order of the Bankruptcy Court or (C) are assumed and assigned by Seller pursuant to Section 2.1(b);

(vi) all safety deposit boxes, lock boxes and the like;

(vii) all owned machinery, equipment (including all transportation and office equipment), fixtures, trade fixtures, computer and information technology equipment and related data, telephone systems and furniture owned by Seller wherever located, including all such items which are located in any Facility;

(viii) all Inventory;

(ix) all claims, including Claims, deposits, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), provided, however that all deposits made by the Seller before Closing pursuant to 19 U.S.C. § 1505(a) shall remain subject to any and all rights of the United States of America, on behalf of the Department of Commerce and the Department of Homeland Security, U.S. Customs and Border Protection;

(x) all security and other deposits and advances and prepaid assets and other current assets, including any Tax receivables and Tax refunds;

(xi) all claims, including Claims, deposits, including those made by Seller with respect to the import of goods and/or duties related thereto, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent);

(xii) the right to receive and retain mail, accounts, notes and credit card receivables payments and other communications;

(xiii) the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(xiv) all Books and Records;

(xv) all advertising, marketing and promotional materials;

(xvi) other than as set forth on Schedule 2.1(a)(xvi), all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies;

(xvii) all goodwill as a going concern and all other intangible properties;

(xviii) all telephone numbers;

(xix) all of Seller's rights to be indemnified except to the extent such rights related to Excluded Assets;

(xx) all rights to proceeds under insurance policies;

(xxi) all security deposits relating to Assigned Contracts; and

(xxii) all cash (including checking account balances, certificates of deposit and other time deposits).

(xxiii) all causes of action, excluding Avoidance Actions.

(b) Notwithstanding anything in this Agreement to the contrary, Buyer may revise Schedule 2.1(a)(v) to remove or add any Lease or Contract from Schedule 2.1(a)(v) and exclude from or include in, as applicable, the definition of Assigned Contracts, such Lease or Contract by (i) in the case of the removal of any Lease or Contract from Schedule 2.1(a)(v), by providing written notice to Seller not less than two (2) Business Days prior to the Sale Hearing, and (ii) in the case of the addition of any Lease or Contract from Schedule 2.1(a)(v), by providing written notice to Seller not less than one (1) Business Day prior to the Cure Notice Deadline, in which case Seller shall provide a Cure Notice to the other parties to any such Lease or Contract by the Cure Notice Deadline, and Seller shall use all reasonable efforts to obtain any necessary Bankruptcy Court approval for the assumption and assignment to Buyer of such additional Assigned Contracts.

(c) At any time, Seller may immediately move to reject any Contract or Lease which is an Excluded Contract upon notice to Buyer and Buyer shall have the right to inform Seller up to fifteen (15) days following the date of the notice thereof to require the Seller to assume and assign such Excluded Contract to Buyer provided any applicable cure costs shall be borne by Buyer.

2.2 Assumption of Liabilities.

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.4 hereto, Buyer shall only assume from Seller and thereafter be responsible for the payment, performance or discharge of the Liabilities and obligations of Seller arising under or in connection with (i) the Lender Debt as of the Closing Date, (ii) the Assigned Contracts after the Closing Date, (iii) the Post-Petition Accounts Payable set forth on Schedule 2.2(a)(iii), (iv) Post-Petition Employee Compensation set forth on Schedule 2.2(a)(iv), and (v) the Allowed Professional Compensation set forth on Schedule 2.2(a)(v) (clauses (i) through (v) together, the "Assumed Obligations").

(b) Section 2.2(a) shall not limit any claims or defenses Buyer may have against any party other than Seller. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Buyer or Seller.

2.3 Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the following assets of Seller shall be retained by Seller and are not being sold or assigned to Buyer hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(a) any and all rights of Seller under this Agreement;

(b) all Contracts and Leases other than the Assigned Contracts listed on Schedule 2.1(a)(v) (taking into account any revisions to Schedule 2.1(a)(v) made by Buyer pursuant to Section 2.1(b)) including, but not limited to, those Contracts and Leases specifically set forth on Schedule 2.3(b) (the "Excluded Contracts");

(c) all rights to proceeds under any director and officer liability insurance policies of Seller for claims arising prior to the Closing;

(e) any asset set forth on Schedule 2.3(e);

(f) all assets maintained pursuant to or in connection with any Employee Benefit Plan;

(g) all Avoidance Actions;

(h) all Floor-Standing, Metal-Top Ironing Tables (classified under HTSUS subheading 9403.20.0011) and Certain Parts Thereof (including metal top and leg components classified under HTSUS subheading 9403.90.8040) from the People's Republic of China (the "Excess Floor-Standing Metal-Top Ironing Boards"); and

(i) all rights and interests, if any, in designs and products alleged by Bajer Design & Marketing, Inc. in Case No. 1:09-cv-01815 filed in the United States District Court for the Northern District of Illinois as infringing its U.S. Pat. No. 5,946,533.

2.4 No Other Liabilities Assumed. Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer will not assume, or in any way be liable or responsible for, any Liability of Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof) or any outstanding checks), whether relating to or arising out of the Business, the Excluded Assets or the Acquired Assets or otherwise, other than the Assumed Obligations. In furtherance and not in limitation of the foregoing, except as specifically set forth in Section 2.2, neither Buyer nor any of its Affiliates shall assume, and shall not be deemed to have assumed, any Liability of any kind or nature whatsoever of Seller resulting from, arising out of, relating to, in the nature of, or caused by (a) any Indebtedness (other than the Assumed Obligations), (b) any Excluded Asset or Excluded Contract, (c) Taxes or escheat obligations of any kind or nature, (d) any Claim arising out of facts, events, circumstances, actions or inactions occurring on or prior to the Closing, (e) any Employee Benefit Plan, (f) any Excluded Environmental Liabilities, (g) any employees of Seller who are not Rehired Employees (except to the extent that any Liability related to such employees constitutes Post-Petition Employee Compensation) and any former employees or any retirees of Seller, or any dependents or beneficiaries thereof, (h) any breach of contract, breach of warranty, tort, infringement or other violation of the rights of another Person (including any Intellectual Property rights) or any lawsuits or violations of Law, (i) any other obligation of Seller or any predecessor or Affiliate of Seller whatsoever or any ERISA Affiliate other than the Assumed Obligations, (j) any Liability or obligation with respect to gift cards, gift certificates or the like, (k) any Liability of Seller arising under the WARN Act (whether prior to or after Closing), if any, including any such Liabilities arising out of or resulting in connection with the Closing and/or the consummation of the transactions contemplated by this Agreement, or (1) any liability arising from the manufacture or import of goods, including, without limitation, anti-dumping duties imposed on Seller pursuant to United States Department of Commerce's anti-dumping duty proceeding (Floor-Standing Metal-Top Ironing Tables (A-570-888), Since Hardware (Guangzhou) Co. Ltd., Federal Register, Sept. 28, 2005 (Vol. 70, No. 187), pp. 55631-55634 (the "Commerce Dept. Proceeding") (collectively, any such obligations, the "Excluded Liabilities").

2.5 Deemed Consents. Seller shall request that by providing notice of its intent to assume and assign any Contract or Lease, that the Bankruptcy Court deem the non-debtor party to such Contract or

Lease to have consented to the sale if, and to the extent that, pursuant to the Sale Order or other Order of the Bankruptcy Court, Seller is authorized to assume and assign to Buyer and Buyer is authorized to accept such Assigned Contracts pursuant to section 365 of the Bankruptcy Code.

2.6 <u>Obligations in Respect of Assigned Contracts</u>. To the extent that any Assigned Contract is subject to a cure pursuant to section 365 of the Bankruptcy Code, Buyer shall be responsible for such cure and pay any amounts related to such cure obligations (the "<u>Cure Costs</u>"). Buyer shall be responsible for paying all costs and expenses accrued under any Assigned Contract subsequent to the Closing Date.

2.7 <u>Post-Closing Assignment of Contracts</u>. With respect to any Contract or Lease which is not set forth on <u>Schedule 2.1(a)(v)</u> and provided such Contract or Lease has not been rejected by Seller pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from Buyer, as soon as practicable, Seller shall take all actions reasonably necessary to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) and Lease(s) set forth in Buyer's notice(s), and any applicable costs incurred subsequent to the Closing Date shall be borne by Buyer. The covenant set forth in <u>Section 2.7</u> shall survive the Closing, subject to the rights of Seller under <u>Section 2.1(d)</u>. Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Lease is assumed and assigned to Buyer pursuant to this <u>Section 2.7</u>, such Contract or Lease shall be deemed an Assigned Contract and deemed scheduled on <u>Schedule 2.1(a)(v)</u> under the appropriate heading for all purposes under this Agreement.

## ARTICLE III

## BASIC TRANSACTION

3.1 <u>Payment of Purchase Price</u>.

(a) In consideration of the sale, transfer, conveyance and assignment of the Acquired Assets to Buyer at the Closing and the assumption and assignment to Buyer of the Assigned Contracts, Buyer shall pay the following purchase price (the "<u>Purchase Price</u>"):

(i) the submission of the Credit Bid, which becomes effective on the Closing Date; and

(ii) the assumption of the Assumed Obligations at the Closing.

(b) Seller acknowledges that the Credit Bid is a valid credit bid under Section 363(k) of the Bankruptcy Code comprised of the validly perfected, allowed secured claims for the Lender Debt.

(c) Any payments made by Buyer to Seller pursuant to this <u>Section 3.1</u> shall be allocated among the assets purchased in accordance with <u>Section 12.7</u>.

3.2 <u>Further Assurances</u>. From time to time after the Closing and without further consideration, (a) upon the request of Buyer, Seller shall execute and deliver such documents and instruments of conveyance and transfer as Buyer may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Buyer title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (b) Buyer, upon the request of Seller, shall execute and deliver such documents and instruments of contract or lease assumption as Seller may reasonably request in order to confirm Buyer's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

4.1 <u>Seller's Representations and Warranties</u>. Seller represents and warrants to Buyer to the best of its Knowledge that the statements contained in this <u>Article IV</u> are correct and complete as of the Closing Date, except as expressly set forth in the schedules relating to this <u>Article IV</u> (the "<u>Disclosure Schedules</u>"). The information disclosed in any numbered part of the Disclosure Schedule shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered section in this Agreement and shall not be deemed to relate to or to qualify any other representation or warranty unless the applicability of such disclosure to such other representation or warranty is reasonably apparent on its face. The mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).

4.2 <u>Validity of Agreement</u>. Subject to any necessary authorization from the Bankruptcy Court, Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. All Transaction Documents to which Seller is a party have been duly executed and delivered by Seller, except such Transaction Documents as are required by the terms hereof to be executed and delivered by Seller after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Seller at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms.

4.3 <u>Organization, Standing and Power</u>. Seller is duly organized, validly existing and in good standing under the Laws of the State of Delaware and is qualified to do business in every jurisdiction in which it is required to be qualified. Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite corporate power and authority to own, lease and operate its properties, to carry on the Business as now being conducted, to execute and deliver the Transaction Documents, subject to Bankruptcy Court authorization and to perform its obligations thereunder, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time, and to general equitable principles.

4.4 <u>No Conflicts</u>. Subject to the approval of the Bankruptcy Court, including pursuant to the entry of the Sale Order, none of the execution, delivery or performance of this Agreement and the Transaction Documents by Seller will (a) conflict with or result in a violation or breach of any of the terms, conditions or provisions of Seller's Certificate of Incorporation or Bylaws, (b) result in the creation or imposition of any Lien upon any of the properties or assets of Seller, or (c) result in a violation or breach of any term or provision of any Law or Order applicable to Seller, other than such violations or breaches which would not materially and adversely affect the validity or enforceability of this Agreement or the Transaction Documents.

4.5 <u>No Consents</u>. No consent, approval or action of, filing with or notice to any Governmental Authority is required to be obtained by Seller in connection with the execution, delivery and performance of this Agreement or any of the Transaction Documents, or the consummation of the transactions contemplated hereby or thereby, except (a) for consents, approvals or actions of and filings with or notice to the Bankruptcy Court and (b) where the failure to obtain any such consent, approval or action, to make any such filing or to give any such notice would not materially and adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement or any of the Transaction Documents or to

perform its obligations hereunder or thereunder or have a Material Adverse Effect on the condition of the Business.

4.6 <u>Legal Proceedings</u>. Except as set forth on <u>Schedule 4.6</u> and except for Claims that will not attach to the Acquired Assets, by virtue of entry of the Sale Order:

(a) Other than the Chapter 11 Case, there are no Proceedings pending or, to the Knowledge of Seller, threatened against, relating to, or affecting Seller with respect to the Business or any of the Acquired Assets which would (i) result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Transaction Documents, or (ii) have a Material Adverse Effect on the Business; and

(b) Except for Orders of the Bankruptcy Court and Orders entered in the Commerce Dept. Proceeding, there are no Orders outstanding against Seller.

4.7 <u>Title to Property</u>. Subject to receipt of the approval of the Bankruptcy Court pursuant to the Sale Order, Seller has, or at the Closing will have, the right to deliver to Buyer good and marketable title to, or a valid leasehold interest in, all of the Acquired Assets free and clear of all liens, claims and interests (other than Permitted Liens).

4.8 <u>Brokers</u>. Except as set forth on <u>Schedule 4.8</u>, Seller has not incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

4.9 <u>Intellectual Property</u>. Except as set forth on <u>Schedule 4.9</u>, Seller (a) owns and possesses all right, title and interest in and to (or has the right to use pursuant to a license or other permission) the Intellectual Property; (b) has no obligation to compensate any Person for the right to use any of the Intellectual Property (except, in the case of Intellectual Property that is licensed, for obligations pursuant to the applicable license agreement); (c) has not granted to any Person any license, option or other similar rights in or to any of the Intellectual Property; (d) has not received any written notice from any Person that challenges the validity or enforceability of any of the Intellectual Property; (e) has not received any notice from any Person challenging Seller's ownership of, or right to use, any of the Intellectual Property; and (f) to the Knowledge of Seller, no Person is infringing upon or has misappropriated any of the Intellectual Property.

4.10 <u>Limitations</u>. Except as expressly provided herein or in the Sale Order approving this Agreement, the Buyer agrees and acknowledges that all transfers of the Acquired Assets are "as is" and "where is", and acknowledges and agrees that the Seller makes no representation of any kind whatsoever with respect to the Acquired Assets or otherwise, express or implied, including but not limited to any representation or warranty regarding the title or condition of the Acquired Assets, or the fitness, desirability, or the merchantability thereof or suitability thereof for any particular purpose, the current or future tax liability, assessment or valuation of any of the Acquired Assets, the compliance of any of the Acquired Assets in their current or future state with applicable laws or the actual projected income or operating expense of the business or Acquired Assets. The Buyer further acknowledges and represents that it has reviewed and inspected the Acquired Assets, has had the opportunity to inspect the books and records of the Seller and the public filing records, and enters into this Agreement after independent investigation of the facts and circumstances relating to the Acquired Assets, the operations of the business and the transactions described herein.

4.11 <u>Contracts</u>. Seller has made available to Buyer a correct and complete copy of each Assigned Contract listed on <u>Schedule 2.1(a)(v)</u> and each Excluded Contract listed on <u>Schedule 2.3(b)</u>, and such Contracts and Leases shall collectively include all of Seller's material Contracts and Leases. In addition,

all Contracts and Leases of Seller existing as of the date hereof are included on Schedule 2.1(a)(v) as Assigned Contracts or Schedule 2.3(b) as Excluded Contracts, and if any additional Contracts or Leases, that are not included on Schedule 2.1(a)(v) or Schedule 2.3(b), are determined after the date hereof to constitute Contracts or Leases, Buyer shall have the right, in its sole discretion, to add such Contract or Lease to Schedule 2.1(a)(v).


## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

5.1 Organization.  Buyer is validly existing and in good standing under the Laws of the State of Missouri and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

5.2 Authority.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Buyer and do not and will not violate any provisions of its organizational documents, any applicable Law or any agreement or instrument by which it is bound or Order binding upon it. This Agreement constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

5.3 No Conflicts or Violations.  The execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Buyer do not and shall not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any Third Party the right to modify, terminate or accelerate any obligation under, or (e) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority, under any agreement or instrument to which Buyer is bound or affected, or any Law to which Buyer is subject or any Order to which Buyer is subject.

5.4 Brokers.  Buyer has incurred no Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

5.5 Confidentiality.  In the event the transactions contemplated hereby are not consummated for any reason, without limiting the other rights and/or remedies of the parties, the Buyer shall promptly return to the Seller, or destroy, all documents and other materials and all copies of the foregoing that were furnished to the Buyer to date in connection with its due diligence investigation of the Seller, its assets or the Seller's business, as provided therein.

5.6 Investigation.  The Buyer has or will make its own investigation concerning the physical condition of the Acquired Assets and the business, the condition of title or any other matter pertaining to the Acquired Assets; and, other than the specific representations made by the Seller pursuant to this Agreement, the Buyer is not relying on any representations, warranties or inducements of the Seller (or any agent of the Seller) with respect to the physical condition of the Acquired Assets, the condition of title to the Acquired Assets or any other matter pertaining to the Acquired Assets or related business.

5.7 No Other Representations or Warranties.  Except for the representations and warranties and covenants contained in this Agreement, Buyer does not make any other express or implied representation or warranty with respect to the transactions contemplated hereby, and Buyer disclaims any other

representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE VI

## COVENANTS OF SELLER; OTHER AGREEMENTS

6.1 <u>Consents and Approvals</u>.

(a) Seller and the Buyer shall use commercially reasonable efforts (i) to obtain all necessary consents and approvals, as reasonably requested by Buyer, to consummate the purchase and sale of the Acquired Assets and the assumption and assignment of the Assigned Contracts, as well as assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining the Bidding Procedures Order and the Sale Order, (ii) to make, as reasonably requested by Buyer, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Seller or any of its Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (iii) to obtain, as requested by Buyer, all required consents and approvals (if any) necessary to assign and transfer Seller's Permits to Buyer at Closing and, to the extent that one or more of Seller's Permits are not transferable, to assist Buyer in obtaining replacements therefor. In the event that certain of Seller's Permits, or any Contract, Lease or other license or agreement necessary for the operation of the Business as presently conducted are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Contracts, Leases or other licenses or agreements are obtainable after the Closing, Seller shall, to the extent reasonably practicable, continue to use such commercially reasonable efforts in cooperation with Buyer after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits, Contracts or other licenses or agreements after Closing and shall do all things necessary to give Buyer the benefits that would be obtained under such Permits, Contracts, Leases or other licenses or agreements, in each case at Seller's sole cost and expense.

(b) Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

6.2 <u>Access to Information and Facilities</u>.  Seller agrees that, prior to the Closing Date, Buyer and its representatives (including its accountants, advisors, consultants and legal counsel) shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Seller, have reasonable access during normal business hours to all Facilities and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Seller (including any environmental audits and investigations or to conduct a physical inventory of the Inventory) and such examination of the Books and Records and financial condition of Seller as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records; <u>provided</u>, that Buyer shall not conduct any soil sampling or similarly invasive environmental testing.

6.3 <u>Conduct of the Business Pending the Closing</u>.  Except as otherwise expressly contemplated by this Agreement, from the date hereof until the Closing Date, Seller shall: (a) conduct the Business in the Ordinary Course of Business; (b) use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations; (c) maintain and operate the Acquired Assets in the Ordinary Course of Business and repair and continue normal maintenance, normal wear and tear excepted; (d) continue to operate the Business in all material respects in compliance with all Laws applicable to Seller or the Business; (d) continue to (i) conduct the Business, (ii) operate the billing and collection policies and procedures with respect to the

Business, (iii) maintain the books and records of the Business in the Ordinary Course of Business (iv) maintain the employees of Seller unless Buyer consents in writing to termination of any employee by the Seller; (e) promptly advise Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect; (f) not sell, lease transfer, mortgage, encumber, alienate, dispose of the Acquired Assets or create any Lien on any of the Acquired Assets; (g) not institute new methods of accounting that will vary materially from the methods used by Seller as of the date of this Agreement except as may be required by GAAP; (h) not enter into any Contract, Lease or purchase order not in the Ordinary Course of Business; (i) not sell Inventory (A) other than in the Ordinary Course of Business, (B) at a discount other than discounts consistent with past practice, or (C) in bulk; and (j) not take any action inconsistent with this Agreement or with the consummation of the Closing.

6.4 <u>Notification of Certain Matters</u>.

(a) Seller shall give notice to Buyer, within twenty-four (24) hours of Seller's Knowledge of the occurrence of the event giving rise to a notice obligation pursuant to this <u>Section 6.4(a)</u>, of (i) the occurrence or nonoccurrence of any event that causes or would be likely to cause, directly or indirectly, any Material Adverse Effect on Seller, or (ii) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 6.4(a)</u> shall not (x) be deemed to amend or supplement any of the Disclosure Schedules, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(b) Seller shall add Buyer, and Buyer's counsel, to Seller's so-called "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on Seller's creditors pursuant to the Bankruptcy Code and Rules.

6.5 <u>Further Assurances</u>. Buyer and Seller shall each execute all documents and take all actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby. Buyer and Seller shall each use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VIII and Article IX, respectively, of this Agreement.

6.6 <u>Bankruptcy Actions</u>.

(a) Within seven (7) days after the date of the commencement of the Chapter 11 Case, Seller shall file and serve a motion (together with supporting papers and with proper notice thereof on interested parties as required by the Bankruptcy Code and Rules) (the "<u>Bid Procedures Motion</u>") seeking entry of the Bidding Procedures Order on the Bankruptcy Court's docket, which order will set a date for the Auction such that not less than the statutory notice of such Auction is provided and so as to allow Third Parties a meaningful opportunity to present a qualifying overbid. Seller shall obtain a hearing in the Bankruptcy Court to approve entry of the Bidding Procedures Order on shortened notice for no later than December 7, 2009.

(b) Simultaneously with the filing of the Bid Procedures Motion, Seller shall file with the Bankruptcy Court a motion seeking to approve the transaction contemplated hereby (the "<u>Sale Motion</u>"), which motion shall seek the Bankruptcy Court's approval of this Agreement, Seller's performance under this Agreement and the assumption and the assignment of the Assigned Contracts (and to the extent contested by a Contract counterparty, Buyer's providing evidence thereof), pursuant to section 365 of the Bankruptcy Code. Buyer shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that the Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to section 363(m) of the Bankruptcy Code and that it has the necessary qualifications to show adequate assurance of future performance with respect to the Assigned Contracts as required by section 365 of the Bankruptcy Code.

(c) A list of the Assigned Contracts (as set forth on Schedule 2.1(a)(v)) shall be described in sufficient detail to provide adequate notice to the non-debtor party to such Assigned Contracts. Upon revision of Schedule 2.1(a)(v) by Buyer pursuant to Section 2.1(b), Seller shall add any Assigned Contracts to the exhibit or remove Assigned Contracts from the exhibit, as applicable. Such exhibit shall set forth the Cure Amounts under each of such Assigned Contracts as determined by Seller based on the Books and Records. In cases in which Seller is unable to establish that a default exists, the relevant Cure Amount shall be set at $0.00.

(d) Prior to the hearing on the Bidding Procedures Motion, Seller will provide Buyer and Lenders with a reasonable opportunity to review and comment upon the proposed form of the Bidding Procedures Order, which shall be in form and substance satisfactory to Buyer and Lenders.

(e) Prior to the hearing on the Sale Motion, Seller will provide Buyer and Lenders with a reasonable opportunity to review and comments upon the proposed form of the Sale Order, which shall be in form and substance satisfactory to Buyer and Lenders.

6.7 Exclusivity; Solicitation.

(a) Buyer and Seller acknowledge that under the Bankruptcy Code the sale of Acquired Assets is subject to approval of the Bankruptcy Court. Buyer and Seller acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Acquired Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Acquired Assets to responsible bidders, entertaining higher or better offers from responsible bidders and, if necessary, conducting an Auction.

(b) Seller represents that, other than the transactions contemplated by this Agreement, Seller is not a party to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of the Business or the Acquired Assets.

(c) In consideration for substantial expenditures of time, effort and expense undertaken and continuing by the Buyer in connection with the preparation, negotiation, and execution of this Agreement and additional Transaction Documents and Financing Documents, Seller acknowledges and agrees that the Buyer shall be the stalking horse bidder at the Auction; provided that consistent with its fiduciary duties to elicit the highest and best offer for the Acquired Assets and to conduct the Auction, Seller may solicit, encourage and negotiate higher or better offers for the Acquired Assets under the terms of the Bidding Procedures Order, and provided further that Seller may (A) in response to an acquisition proposal for some or all of the Acquired Assets that was not solicited after the date hereof, participate in negotiations or discussions with, request clarifications from, or furnish information to, any qualified person which makes such acquisition proposal, and (B) continue discussions and negotiations and continue to provide information to any qualified person, group or other entity with which Seller has been conducting such discussions or negotiations.

6.8 Other Bids. Buyer acknowledges that both before and after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, Seller may solicit bids ("Bids") from Third Parties (each Third Party submitted a Bid, a "Bidder") for the sale of all or substantially all of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement (or improved terms) and in accordance with the procedures set forth in the Bidding Procedures Order and Section 8.2(c) below.

6.9 Excluded Assets and Liabilities. Subsequent to the Closing, Seller agrees to indemnify, defend, protect, and save and hold Buyer harmless with respect to the Excluded Assets and Excluded Liabilities. Seller's obligations under this section shall be an administrative expense priority obligation under section 507(a)(2) of the Bankruptcy Code.

6.10 Taxes.

(a) On or prior to the Closing (or after the Closing when due and payable, to the extent such Taxes are due and payable after the Closing), Seller shall pay all sales taxes, use taxes, payroll taxes, and Taxes which will be owed by Seller and attributable to periods prior to the Closing.

(b) Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges due and which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Seller, and Seller shall prepare and timely file all Tax Returns required to be filed in connection with such payments.

## ARTICLE VII

## COVENANTS OF BUYER

7.1 Assumed Obligations.  Subsequent to the Closing, Buyer agrees to be responsible for the payment and performance of the Assumed Obligations.

7.2 Operation.  Buyer shall be obligated to discharge, pay, perform and satisfy all of the duties, liabilities and obligations arising, from and after the Closing, from the ownership, maintenance, operation, use, development, sale or leasing of, or other operation of business with respect to the Acquired Assets and the Assigned Contracts.

7.3 Further Assurances.  Buyer shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby. Buyer shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article IX of this Agreement.

7.4 Release of Chief Sales Officer. Buyer shall release the Chief Sales Officer from and on account of any demands, suits, or claims of any sort arising out of or in connection with the sale of the Acquired Assets hereunder, except for claims arising out of or relating to any gross negligence or willful misconduct of the Chief Sale Officer.

All of Buyer's covenants set forth in this Article VII and under Article XII shall survive the Closing.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer under this Agreement are, at the sole option and discretion of Buyer, subject to satisfaction of the following conditions precedent on or before the Closing Date.

8.1 Warranties True as of Both Present Date and Closing Date; Covenants.

(a) All of the representations and warranties of Seller shall be true and correct in all material respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date) with the same force and effect as though made on and as of the Closing Date.

(b) Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

8.2 Bankruptcy Conditions.

(a) The Bidding Procedures Order shall have been entered on the docket by the Clerk of the Bankruptcy Court on or before December 7, 2009. The Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court on or before January 15, 2010.

(b) The Sale Order shall approve and authorize the assumption and assignment of the Assigned Contracts and the Assigned Contracts shall have been actually assumed and assigned to Buyer such that the Assigned Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims (including, without limitation, cure claims under section 365 of the Bankruptcy Code, except as otherwise specifically provided in the Sale Order) existing as of the Closing or by reason of the Closing.

(c) The Bidding Procedures Order shall provide, among other things, that:

(i) upon the first to occur of (A) the date Seller consummates an Alternative Transaction, (B) the date Seller files a Chapter 11 plan contemplating the sale or retention of any of the Acquired Assets by Seller and/or the disposition of any of the Assigned Contracts in a manner substantially inconsistent with the terms of this Agreement, or (C) the confirmation of a plan of reorganization of Seller by the Bankruptcy Court that does not contemplate all of the transactions contemplated by this Agreement, Seller shall be obligated to pay Buyer the amount of $200,000 (in cash) as reimbursement for all out-of-pocket costs and expenses (including attorneys' fees and expenses) incurred by Buyer in connection with the Bankruptcy Case and the negotiation, execution and delivery of this Agreement and the Transaction Documents, the Financing Documents and other legal work concerning acquisition of the business or assets of Seller ("Expense Reimbursement"), which payment shall be made in accordance with Section 11.2;

(ii) Buyer, by agreement of Lenders and Buyer, is entitled to bid the Credit Bid under Section 363(k) of the Bankruptcy Code;

(iii) no party submitting any other offer to purchase the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, or termination or similar fee or payment;

(iv) prior to receipt by a prospective Bidder of any non-public information (including, without limitation, business and financial non-public information and access to representatives of Seller) from Seller, each Bidder will be required to execute an appropriate confidentiality agreement;

(v) as part of any Bid, each Bidder shall submit a copy of this Agreement marked to show changes, along with any other bid package requirements to Seller and Buyer, and place into escrow a cash deposit of no less than $250,000;

(vi) (A) a competing Bid will not be considered by Seller or the Bankruptcy Court as qualified for the Auction unless such competing Bid is for an amount equal to, or greater than the aggregate of the sum of (I) the Credit Bid; and (II) $300,000 (representing the amount of the Expense Reimbursement plus $100,000); (B) any subsequent competing Bids submitted at the Auction must be higher than the immediately preceding Bid in increments of not less than $100,000 in cash; provided, however, any competing Bid submitted at the Auction by Buyer shall be increased by the dollar value of the Expense Reimbursement for purposes of determining whether it constitutes the Highest or Best Bid; and (C) a Bid will not be considered by Seller as qualified for the Auction if: (I) such Bid contains financing or due diligence contingencies of any kind; (II) such Bid consists of any form of consideration other than cash consideration, payable

by wire transfer of immediately available funds to the account or accounts designated in writing by Seller; (III) such Bid is not received by Seller and Buyer in writing at least four (4) Business Days prior to the Sale Hearing; (IV) such Bid does not contain evidence that the Person submitting it has received debt and/or equity funding commitments or available cash sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than **$250,000** in cash; or (V) such bid is otherwise determined by the Chief Sale officer to be made in bad faith and such determination is not reversed by a Final Order of the Bankruptcy Court (each Bid that satisfies the criteria set forth in sub-paragraphs A and B and also is not excluded pursuant to sub-paragraph C constitutes a "Qualifying Bid");

(vii) if one or more Qualifying Bids are submitted in accordance with the Bidding Procedures Order, Seller will conduct the Auction as set forth in this Agreement. At the Auction, Buyer and all Persons who submitted a Qualifying Bid pursuant to Section 8.2(c)(vi) shall have the right to submit further Bids along with a copy of this Agreement marked to show changes. Seller shall have the right to select the highest or best Bid from Buyer and any Person who submitted a Qualifying Bid pursuant to Section 8.2(c)(viii) (the "Highest or Best Bid"), which will be determined by considering, among other things: (A) the number, type, and nature of any changes to this Agreement requested by each Bidder; (B) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to Seller of such modifications or delay, including potential decrease in purchase sale price of Seller's Assets if not sold by the Closing Date; (C) the total consideration to be received by Seller; (D) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (E) the net benefit to the estate, taking into account Buyer's rights to the Expense Reimbursement;

(viii) Not later than eleven (11) Business Days prior to the Sale Hearing (such date, the "Cure Notice Deadline"), Buyer shall provide a notice (the "Cure Notice") to each non-debtor party to an Assigned Contract set forth in Schedule 2.1(a)(v), which Cure Notice shall, among other things, (A) provide notice of the proposed assumption and assignment of the Assigned Contract to Buyer, (B) contain a calculation of the Cure Amount, and (C) provide notice of the deadline to object to the Cure Notice, which deadline shall be four (4) Business Days prior to the Sale Hearing.

(ix) unless otherwise agreed to by Buyer, only the Persons who submitted Qualified Bids, the Buyer, the Lenders, any Committee, and the United States Trustee may participate in the Auction; and

(x) Seller shall not contest any argument by Buyer that it has standing to contest the Highest or Best Bid selected by Seller.

(d) Notwithstanding Sections 8.2(a) and 10.1, nothing in this Agreement shall preclude Buyer or Seller from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders. No notice of such waiver of this or any other condition to Closing need be given except to Lenders, any Committee, and the United States Trustee, it being the intention of the parties hereto that Buyer shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of Final Orders.

8.3 Material Adverse Change. There shall not have occurred a Material Adverse Change since the date of this Agreement.

8.4 Litigation. No Order shall have been entered that restrains or prohibits the consummation of the transactions contemplated by this Agreement.

8.5 <u>Approvals</u>.  All authorizations, consents, filings and approvals necessary to permit Seller to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Buyer, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at the option of Seller, subject to the satisfaction of the following conditions precedent on or before the Closing Date.

9.1 <u>Warranties True as of Both Present Date and Closing Date</u>.  The representations and warranties of Buyer contained herein shall be true and correct in all material respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made by Buyer on and as of the Closing Date, except those qualified by materiality shall be true and correct in all respects. Buyer shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

9.2 <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order.

9.3 <u>Litigation</u>.  No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or involving a claim that consummation thereof would result in the violation of any Law.

9.4 <u>Approvals</u>.  All authorizations, consents, filings and approvals necessary to permit Buyer to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Seller, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

## ARTICLE X

## CLOSING

10.1 <u>Closing</u>.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Affinity Law Group, LLC, 755 S. New Ballas Road, Suite 140, St. Louis, Missouri 63141 at 11:00 A.M. Central time no later than the first business day after the date on which the conditions set forth in <u>Article VIII</u> and <u>Article IX</u> have been satisfied or waived, or on such other date or place as Buyer and Seller may determine (the "<u>Closing Date</u>").

10.2 <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver or procure delivery to Buyer of:

(a) one or more bills of sale, in form and substance reasonably satisfactory to Buyer and Lenders, conveying in the aggregate all of the owned personal property of Seller included in the Acquired Assets, duly executed by Seller;

(b) one or more assignments of the Assigned Contracts and assumptions of the Assumed Obligations, in form and substance reasonably satisfactory to Buyer and Lenders (collectively, the "Assignment and Assumption"), duly executed by Seller;

(c) duly executed Intellectual Property Assignments, in form and substance reasonably satisfactory to Buyer and Lenders, each in recordable form to the extent necessary to duly assign such rights to Buyer;

(d) certificates of title and title transfer documents to all titled motor vehicles;

(e) an assignment and assumption agreement with respect to Seller's Permits and warranties in form and substance reasonably acceptable to Buyer and Lenders, whereby Seller shall assign to Buyer all of their respective rights in and to any Permits and warranties relating (directly or indirectly) to the Acquired Assets or the Business, to the extent such Permits and warranties are assignable;

(f) all the Books and Records, and any data related to the Business;

(g) such other instruments, in form and substance, reasonably satisfactory to Buyer, as are necessary to vest in Buyer good and marketable title in and to the Acquired Assets in accordance with the provisions hereof;

(h) such documentation as may be necessary to change the authorized signatories on any bank accounts to be transferred hereby or powers of attorney relating (directly or indirectly) to the Acquired Assets or the Business; and

(i) a certified copy of the Sale Order; and

(j) an affidavit, as provided in Section 1445(b)(2) of the Code, stating under penalties of perjury that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

10.3 Deliveries by Buyer.  At the Closing, Buyer will deliver to Seller (a) the Assignment and Assumption duly executed by Buyer and (b) a release by Lenders of Seller from the amount of the Lender Debt represented by the Credit Bid; and (c) cash for any amount of the Purchase Price in excess of the Lender Debt that is payable to Seller.

10.4 Form of Instruments.  To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

<h1 style="text-align:center">ARTICLE XI</h1>

<h2 style="text-align:center">TERMINATION; TERMINATION PAYMENT</h2>

11.1 Termination.  This Agreement may be terminated prior to the Closing as follows:

(a) by mutual written agreement of Buyer and Seller;

(b) by either Buyer or Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c) by either Buyer or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants or obligations set forth in this Agreement on the part of Seller, on the one

hand, or the Buyer on the other hand, which breach would give rise to the failure of the conditions set forth in Section 8.1 or 9.1, as applicable, and such breach is not cured within ten days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d) by Buyer or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that a material condition set forth in Article IV, Article VIII and Article IX for the benefit of the terminating party has not been or cannot be fulfilled or satisfied prior to the Termination Date and has not been waived by the terminating party, provided that the terminating party shall not be responsible for the failure of such condition to be satisfied;

(e) by Buyer if Seller (i) seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or a Chapter 11 plan contemplating the sale or retention of the Acquired Assets in a manner substantially inconsistent with the terms of this Agreement or (ii) executes and delivers an agreement or understanding of any kind with respect to an any of the items described in the foregoing clause (i);

(f) by Buyer or Seller if the Bankruptcy Court enters an order approving any Alternative Transaction (other than the sale of the Business and the Acquired Assets to Buyer);

(g) by Buyer on any day on or after February 1, 2010 (the "Termination Date") if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of the Buyer to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(h) by Buyer if there is any "Event of Default" as defined under any material Assigned Contract that cannot be cured within a reasonable time prior to the Termination Date;

(i) by Buyer if the Bankruptcy Court fails to enter the Bidding Procedures Order (in form and substance acceptable to Buyer and Lenders) on or before December 7, 2009;

(j) by Buyer if the Bankruptcy Court fails to enter the Sale Order (in form and substance acceptable to Buyer and Lenders) on or before January 15, 2010.

11.2 Expense Reimbursement.

(a) Following the first to occur of (i) the date Seller consummates an Alternative Transaction or (ii) following approval of the Bidding Procedures Order, on the date Seller files a Chapter 11 plan contemplating the sale or retention of any of the Acquired Assets and/or disposition of any of the Assigned Contracts by Seller in a manner substantially inconsistent with the terms of this Agreement, Buyer shall be entitled to a super-priority administrative expense claim, pursuant to section 364(c)(1) of the Bankruptcy Code in the amount of the Expense Reimbursement (the "Buyer Superpriority Claim"); provided, however, that the Buyer Superpriority Claim shall be subordinate to all liens and security interests of Lenders and any administrative expenses of Lenders in the Chapter 11 Case.

(b) Each of the parties' obligations to make payments pursuant to this Section 11.2 shall survive termination of this Agreement, other than in an instance in which this Agreement is terminated as a result of the Bankruptcy Court's failure to approve the Bidding Procedures Order (for reasons other than Seller's breach of an obligation under this Agreement).

11.3 Effect of Termination or Breach. If the transactions contemplated hereby are not consummated (a) this Agreement shall become null and void and of no further force and effect, except

(i) for this Section 11.3 and (ii) for the provisions of Sections 6.9, 11.2, 13.1, 13.2, 13.4, 13.7, 13.8, 13.9, 13.10, 13.11, and 13.12 hereof, each of provisions set forth in (i) and (ii) above to survive the termination of this Agreement; (b) the receipt by the Buyer of the Expense Reimbursement which shall be payable in accordance with Section 11.2, shall be the Buyer's sole and exclusive remedy (as liquidated damages) other than for claims based on actual fraud, and the Buyer shall not be entitled to any other damages, losses, or payment from Seller, and Seller shall have no further obligation of Liability of any kind to the Buyer or its Affiliates on account of this Agreement; and (c) if this Agreement is terminated for any reason other than the termination of this Agreement by Seller pursuant to Section 11.1(c), Seller shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further obligation or Liability of any kind to Seller or any of its Affiliates on account of this Agreement.

## ARTICLE XII

## ADDITIONAL POST-CLOSING COVENANTS

12.1 Employees.

(a) Buyer shall offer employment immediately prior to the Closing (but contingent on the occurrence of the Closing) to such employees of Seller actively employed or engaged principally in the Business as of the Closing Date as determined by Buyer in its sole discretion (such employees who accept such offer of employment, the "Rehired Employees") on terms and conditions as determined by Buyer in its sole discretion provided that not fewer than 90% of Seller's employees shall be offered employment by Buyer.

(b) Nothing contained in this Agreement shall confer upon any employee of Seller prior to the Closing or Rehired Employee any right with respect to continuance of employment by Buyer or any of its Affiliates, nor shall anything herein interfere with the right of Buyer or any of its Affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict Buyer or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.

12.2 Certain Consents. If a consent of a Third Party which is required in order to assign any Acquired Asset (or Claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of Seller to convey its interest in question to Buyer, Seller will cooperate with Buyer and use commercially reasonable efforts in any lawful arrangement to provide that Buyer shall receive the interests of Seller in the benefits of such Acquired Asset. If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, Seller agrees to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

12.3 Post-Closing Operation of Seller; Name Changes. Provided Buyer is approved as the successful bidder at the Sale Hearing, from and after the Closing, Seller except as provided herein will cease using the Acquired Assets. If requested by Buyer after the Closing, Seller shall take all necessary action to change its name to a name bearing no resemblance to the names set forth on the signature pages to this Agreement and will file such documents as are necessary to reflect such name change in the States in which Seller is incorporated and the other jurisdictions where Seller is qualified to do business as a foreign entity, in which case Seller shall promptly notify Buyer of such name change and the name chosen by Seller. Notwithstanding the foregoing, Seller may refer to "Whitney Design, Inc." as a former name for legal and noticing purposes in the Chapter 11 Case and other legal documents.

12.4 Accounts Receivable Deposits; Collections. After the Closing, Seller shall permit, and hereby authorizes, Buyer to collect, including pursuit of collection, in the name of Seller, all accounts, notes, credit card receivables and deposits constituting part of the Acquired Assets and to endorse with

the name of Seller for deposit in Buyer's account any checks or drafts received in payment thereof. Seller shall promptly deliver to Buyer any cash, checks or other property that Seller may receive after the Closing in respect of any accounts, notes and credit card receivables or other asset constituting part of the Acquired Assets.

12.5  Sublease of Computer Equipment/Facilities.  After the Closing, in the event that the Lease of the Facilities and the Leases of computer equipment and software are Assigned Contracts, Buyer shall permit Seller and/or its Affiliates to sub-lease up to 30,000 square feet of warehouse space at the Facilities for a period of ninety (90) days and shall permit Seller to access computers, computer software and programs during business hours, promptly upon advance request, for a period of up to sixty (60) days post-Closing.

12.6  Tax Matters.  Buyer shall, within 120 days after the Closing Date, prepare and deliver to Seller a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the Acquired Assets in accordance with the requirements of section 1060 of the Code (such schedule, the "Allocation"). Buyer and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Authority or any other proceeding). Buyer and Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 12.6 shall survive the Closing without limitation.

12.7  Storage and Insurance.  Buyer shall provide rent-free storage to Seller for the Excess Floor-Standing Metal-Top Ironing Boards for ninety (90) days following the Closing.  Buyer and Seller shall further cooperate to ensure that the Excess Floor-Standing Metal-Top Ironing Boards are adequately insured against property or casualty loss.

## ARTICLE XIII

## MISCELLANEOUS

13.1  Survival.  The representations and warranties contained in this Agreement shall not survive the Closing. Each of the covenants and obligations of Buyer and Seller in this Agreement and in the other Transaction Documents shall survive in accordance with their respective terms.

13.2  Expenses.  Except as provided in Section 8.2(c) or 11.2 hereof, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

13.3  Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller and Buyer.

13.4  Notices.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, email or other wire transmission (with answer back confirmation of such transmission, and, if sent by email, provided that a copy of such notice, request or instruction or other document be sent by overnight delivery), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal

Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

To Seller:              Whitney Design, Inc.
                        c/o Brent A. Baxter
                        Clayton Capital Partners
                        8820 Ladue Road, Suite 101

        With a copy to: David A. Warfield, Esq.
                        Thompson Coburn
                        One US Bank Plaza
                        St. Louis, MO 63101-1611
                        Phone: 314.552.6079
                        Fax: 314.552.7079


To Buyer:               Household Essentials, LLC
                        Attn: James Glenn
                        5895 North Lindbergh Blvd.
                        St. Louis, Missouri 63042


        With a copy to: Affinity Law Group, LLC
                        Attn: Robert E. Guest, Jr.
                        755 S. New Ballas Rd., Suite 140
                        St. Louis, Missouri 63141
                        Phone: 314.872.3333

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

13.5 Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller in the case of a waiver by Seller, or Buyer, in the case of any waiver by Buyer, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

13.6 Counterparts and Execution. This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

13.7 SUBMISSION TO JURISDICTION. THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

13.8 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Missouri without regards to any conflict of Law principles as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

13.9 <u>Binding Nature; Assignment</u>.  Subject to approval of the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party (which shall not be unreasonably withheld or delayed); except that (a) Buyer may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Buyer (whether wholly owned or otherwise) or to its lenders and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; (b) the rights and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; and (d) as otherwise provided in this Agreement. Seller hereby agrees that Buyer may grant a security interest in its rights and interests hereunder to its lenders, and Seller will sign a consent with respect thereto if so requested by Buyer or its lenders (upon approval by the Bankruptcy Court as necessary), and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

13.10 <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns and any Persons named as an indemnitee herein, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

13.11 <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

13.12 <u>Public Announcements</u>.  Except as required by this Agreement, Law or in connection with the Chapter 11 Case, neither Seller nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, Seller shall give Buyer a copy of the proposed disclosure and reasonable opportunity to comment on the same and shall use its best efforts to include Buyer's comments in such public disclosure. For purposes of clarity, the reference to "applicable Law" in the preceding sentence does not include filings in the Chapter 11 Case.

13.13 <u>Entire Understanding</u>.  This Agreement, the other Transaction Documents and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.  The Parties acknowledge and agree that this Agreement is being executed without the Schedules referenced herein, and further agree that the Schedules will be prepared as soon as practicable following execution and included as finally agreed upon as part of this Agreement immediately prior to the Closing.

13.14 <u>Closing Actions</u>.  All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to

the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

13.15 <u>Conflict between Transaction Documents</u>.  The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Asset Purchase Agreement to be executed and delivered on the date first above written.

**BUYER:**

HOUSEHOLD ESSENTIALS, LLC

By:     */s/ James L. Glenn*
Name:     James L. Glenn
Title:     President/CEO

**SELLER:**

WHITNEY DESIGN, INC.

By:     */s/ Brent A. Baxter*
Name:     Brent A. Baxter
Title:     Chief Sales Officer

**SIGNATURE PAGE TO AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

<u>**EXHIBIT A**</u>

**Definitions**

"<u>Acquired Assets</u>" shall have the meaning set forth in <u>Section 2.1(a)</u> hereof.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"<u>Affiliated Group</u>" means an affiliated group as defined in section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which Seller is or has been a member.

"<u>Agreement</u>" means this Asset Purchase Agreement, including all the Schedules hereto, as the same may be amended, modified or waived from time to time in accordance with its terms.

"<u>Allocation</u>" shall have the meaning set forth in <u>Section 12.7</u> hereof.

"<u>Alternative Transaction</u>" means any transaction occurring after the Bidding Procedures Order is entered involving the consummation of the sale pursuant to section 363(b) of the Bankruptcy Code of all or a material portion of the Acquired Assets by the Seller to a buyer or buyers other than the Buyer at any time during the pendency of the Chapter 11 Case.

"Allowed Professional Compensation" shall mean the compensation for fees and charges and reimbursement of expenses set forth in Schedule 2.2(a)(v) and allowed by Final Order of the Bankruptcy Court pursuant to Section 326 through 331 of the Bankruptcy Code and payable to any professional retained by the Debtor, a Committee, or any other representative of the Seller's bankruptcy estate, which payment is consistent with all applicable provisions of the Financing Orders and any other Order of the Bankruptcy Court.

"<u>Assignment and Assumption</u>" shall have the meaning set forth in <u>Section 10.2(b)</u> hereof.

"<u>Assigned Contracts</u>" means all Contracts and Leases identified in <u>Schedule 2.1(a)(v)</u>.

"<u>Assumed Obligations</u>" shall have the meaning set forth in <u>Section 2.2(a)</u> hereof.

"<u>Auction</u>" shall mean the auction conducted by Seller pursuant to the Bidding Procedures Order and <u>Section 8.2(c)</u> hereof for substantially all of the Acquired Assets, which shall occur, if at all, on the first Business Day immediately preceding the Sale Hearing.

"<u>Avoidance Actions</u>" means a right to recover, or to obtain other relief arising under or referenced in: § 550 of the Bankruptcy Code; the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act as enacted in any state, or any other law providing for recovery of consideration given, or reversal of any transfer by or for the benefit of Seller.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Missouri.

"<u>Bid</u>" or "<u>Bids</u>" shall have the meaning set forth in <u>Section 6.9</u> hereof.

"<u>Bidders</u>" shall have the meaning set forth in <u>Section 6.9</u> hereof.

"Bidding Procedures Order" means Final Order of the Bankruptcy Court, in form and substance acceptable to the Buyer and Lenders which includes, among other things, provisions approving and implementing Sections 6.6, 6.7, 8.2(c) and 11.2 hereof.

"Books and Records" means all records and lists of Seller including: (i) all merchandise, analysis reports, marketing reports and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to past or present customers, suppliers or personnel of Seller (including customer lists, mailing address lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers and any other written or electronic identifiable data relating to past or present customers or suppliers of the Business or personnel of Seller which has been created by Seller or its representatives, agents or employees), all records relating to all product, business and marketing plans of Seller, and (iii) all books, ledgers, files, reports, plans, drawings and operating records of every kind of Seller; provided, however, "Books and Records" shall not include any records exclusively related to the Excluded Assets or Seller's minute books, stock books and Tax Returns.

"Business" means the business activities carried on by or on behalf of Seller.

"Buyer" shall have the meaning set forth in the preamble hereof.

"Chapter 11 Case" means the case commenced by Seller under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Chief Sales Officer" means Brent Baxter of Clayton Capital Partners, in such capacity.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" shall have the meaning set forth in Section 10.1 hereof.

"Closing Date" shall have the meaning set forth in Section 10.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Committee" means a statutory committee appointed by the Bankruptcy Code in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Court.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party and which Seller is permitted under the Bankruptcy Code and applicable law to assume and assign other than an Employee Benefit Plan.

"Copyright Assignment" means a copyright assignment in form and substance reasonably satisfactory to Buyer.

"Credit Bid" means Buyer's exercise of Lender's credit bid rights pursuant to Section 363(k) of the Bankruptcy Code for the Acquired Assets in the full amount of the Lender Debt as of the Closing Date (as calculated by Lenders and provided to Buyer prior to submission.

"DIP Financing Orders" means all Orders (whether denominated interim or final) entered by the Bankruptcy Court in the Chapter 11 Case that relate to the Lender Debt or the use of the Lender's cash collateral.

"Disclosure Schedules" shall have the meaning set forth in Section 4.1 hereof.

"Dollars" or "$" means dollars of the United States of America.

"Eagle Fund" means Eagle Fund I, L.P., a Delaware limited partnership.

"Enterprise Bank" means Enterprise Bank & Trust, a Missouri chartered bank and trust company.

"Excluded Assets" shall have the meaning set forth in Section 2.3 hereof.

"<u>Excluded Contracts</u>" shall have the meaning set forth in <u>Section 2.3(b)</u> hereof.

"<u>Excluded Environmental Liabilities</u>" means any Liability or investigatory, corrective or remedial obligation, arising under environmental Laws with respect to Seller or any predecessor or Affiliate of Seller, arising out of or relating to the operation, use or environmental condition of the Business, the Acquired Assets or the Facilities prior to the Closing (including any arising from the on-site or off-site release, threatened release, treatment, storage, disposal, or arrangement for disposal of, or exposure to hazardous substances) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any Disclosure Schedule.

"<u>Excluded Liabilities</u>" shall have the meaning set forth in <u>Section 2.4</u> hereof.

"<u>Expense Reimbursement</u>" shall have the meaning set forth in <u>Section 8.2(c)(i)</u> hereof.

"<u>Facilities</u>" means collectively the premises at which Seller operates the Business, namely Seller's corporate headquarters facility of approximately 152,054 square feet of office space located in St. Louis, Missouri.

"<u>Financing Documents</u>" means loan facilities related to Buyer's acquisition of the Acquired Assets or Lenders' financing of the operation of the Business during the Bankruptcy Case or after the Closing Date.

"<u>Final Order</u>" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"<u>GAAP</u>" means, at a given time, United States generally accepted accounting principles, consistently applied.

"<u>Governmental Authority</u>" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"<u>Highest or Best Bid</u>" shall have the meaning set forth in <u>Section 8.2(c)(ix)</u> hereof.

"<u>Indebtedness</u>" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"<u>Intellectual Property</u>" means all of the following in any jurisdiction throughout the world: (i) inventions (whether or not patentable or reduced to practice), all improvements thereto, and patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, reexaminations and counterparts thereof; (ii) trademarks, service marks, trade dress, logos, slogans, trade names, internet domain names, corporate names and all other indicia of origin, together with all translations, derivations and combinations thereof, and together with all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) works of authorship (whether or not copyrightable), and copyrights, mask works and copyrightable works, and applications, registrations and renewals in connection therewith; (iv) trade secrets, know-how and other confidential, proprietary or business information (including ideas, research and development, formulas, compositions, manufacturing, production and other processes and techniques, methods, designs, technical

and other data, charts, plans, diagrams, drawings and specifications, customer and supplier lists and business, marketing and other plans, studies and proposals); (v) computer software (including source code, executable code data, databases and documentation) and systems; (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium; (vii) all other intellectual property and proprietary rights; and (viii) the right to sue and recover for any past, present or future infringement, misappropriation, dilution or any other causes of action, and to recover or collect any damages, proceeds, income, royalties or other payments in connection with or relating to any of the foregoing.

"Intellectual Property Assignments" means the Trademark Assignment and the Copyright Assignment.

"Inventory" means all inventory of any kind or nature owned by Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, and fuels and other and similar items.

"Knowledge of Seller" shall mean the actual knowledge of each of Seller's Chief Executive Officer and Chief Financial Officer.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority, or common law.

"Lease" means any agreement pursuant to which Seller is a lessee of personal property or a lessee or tenant with respect to real property and/or improvements therein, in each instances as to which the leasehold period has not expired.

"Lender Debt" means collectively, the Senior Secured Debt and the Subordinated Debt.

"Lenders" means Enterprise Bank and Eagle Fund.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee or continuation of Seller or the Business, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unified, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" or "Material Adverse Effect" means any event, condition, development or effect that individually or in the aggregate with all other events, changes, conditions, developments and effects, is or is reasonably likely to be materially adverse to (i) the Acquired Assets and Assumed Obligations or (ii) the ability of Seller to perform its obligations under this Agreement, provided, however, that none of the following shall be deemed in and of itself, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Change or a Material Adverse Effect: (a) the filing of the Chapter 11 Case, (b) changes in economic conditions generally or in the industries in which Seller operates, except to the extent such changes have a disproportionate effect on Seller, (c) any change of Law, accounting standards or regulatory policy, (d) changes or adverse conditions in the securities markets, including those relating to debt financing, except to the extent such changes have a

disproportionate effect on Seller, and (e) any actions specifically required to be taken pursuant to this Agreement.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Seller in the usual and ordinary course in a manner substantially similar to the manner in which Seller operated, consistent with past practice prior to the date hereof, subject to any obligations as a debtor under the Bankruptcy Code or any order of the Bankruptcy Court.

"Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Permitted Liens" means easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Petition Date" means the date the Chapter 11 Case is commenced.

"Post-Petition Accounts Payable" shall mean post-petition trade account payables incurred in the Ordinary Course of Business and other post-petition current Liabilities incurred in the Ordinary Course of Business set forth in Schedule 2.2(a)(iii), payment of which is consistent with all applicable provisions of the Financing Orders and any other Order of the Bankruptcy Court. "Post-Petition Accounts Payable" shall not include Liabilities arising from breach of contract, breach of warranty, tort, infringement or other violation of the rights of another Person (including any Intellectual Property rights), lawsuits or violation of Law or any other act or liability not otherwise set forth Schedule 2.2(a)(iii).

"Post-Petition Employee Compensation" shall mean post-petition obligations with respect to any unpaid wages, salary, unused vacation or sick leave earned and accrued (to the extent not paid) with respect to the Rehired Employees that are set forth in Schedule 2.2(a)(iv), payment of which is consistent with all applicable provisions of the Financing Orders and any other Order of the Bankruptcy Court

"Proceeding" means any claim, charge, complaint, dispute, demand, action, investigation, inquiry, audit, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, arbitration, account, contribution, and/or other causes of action of whatever kind or character.

"Purchase Price" shall have the meaning set forth in Section 3.1(a) hereof.

"Qualifying Bid" shall have the meaning set forth in Section 8.2(c)(viii) hereof.

"Rehired Employees" shall have the meaning set forth in Section 12.1 hereof.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein.

"Sale Motion" shall have the meaning set forth in Section 6.6(b) hereof.

"Sale Order" means the Final Order of the Bankruptcy Court, in form and substance acceptable to the Buyer and Lenders and to be filed with the Bankruptcy Court on or before two (2) business days before the Sale Hearing, to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the

Bankruptcy Code that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

"Schedules" means the schedules attached hereto (including the Disclosure Schedules).

"Seller" shall have the meaning set forth in the preamble hereof.

"Senior Secured Debt" means collectively the joint and several indebtedness, liabilities and other obligations of Seller and Tricor Consumer Products, Inc., to Enterprise Bank under (a) that certain Loan and Security Agreement, dated May 5, 2008, as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated April 17, 2009, and as further amended pursuant to that certain Second Amendment to Loan and Security Agreement and First Amendment to Revolving Credit Note, dated November 24, 2009; (b) that certain Revolving Credit Note, dated May 5, 2008, in the original amount of $7,500,000.00, and (c) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Enterprise Bank, .

"Subordinated Secured Debt" means collectively the joint and several indebtedness, liabilities and other obligations of Seller and Tricor Consumer Products, Inc. to Eagle Fund under (a) that certain Note and Warrant Purchase Agreement dated January 19, 2006, as amended by that certain First Amendment to Note and Warrant Purchase Agreement dated as of June 6, 2007, (b) that certain Promissory Note in the original principal amount of $1,500,000, dated as of January 19, 2006, issued by the Seller and Tricor Consumer Products, Inc. in favor of Eagle Fund, (c) that certain Warrant, dated as of January 19, 2006, issued by Tricor Consumer Products, Inc. to Eagle Fund pursuant to which Tricor Consumer Products, Inc. agreed to repurchase certain contractual rights from Eagle Fund for $1,331,500, and (d) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Eagle Fund..

"Subsidiary" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, real property, personal property, unclaimed property, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type

described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Seller, Buyer or any of their respective Affiliates.

"Trademark Assignment" means the trademark assignment in form and substance reasonably satisfactory to Buyer.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended.

# DISCLOSURE SCHEDULES

to

# THIRD AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

by and between

# HOUSEHOLD ESSENTIALS, LLC, as Buyer,

and

# WHITNEY DESIGN, INC., as Seller

Closing Date:  January 29, 2010

Sales Representative Agreement
Anderson Sommers
42 Fifth Avenue
Saratoga Springs, NY 12866

Independent Contractor Agreement, dated July 1, 2009
CRG Consulting, Inc
2100 S.W. Wildwood Ave.
Bentonville, AR 72712

Sales Representative Agreement
Dave Johnson
4400 Pemberton Cove
Alpharetta, GA 30022

Patent Royalty License Agreement, dated August 1, 2002
Dennis Hydron
1920 12th Ave.
Sacramento, CA 95818

Sales Representative Agreement
Direct Link Marketing
14804 N.E. 20th Circle
Vancouver, WA 98684

Lease dated April 29, 2008 on 5895 North Lindbergh Drive
Duke Realty Limited Partnership
520 Maryville Center Drive, Suite 200
Saint Louis, MO 63141-5819

License Agreement for Utility Patents and Patent
Applications, dated March 16, 2009
Esecson Associates, Inc.
dba A-Team Collaborative
P.O. Box 339
Kailua, HI 96734

Sales Representative Agreement
Hi-Light Imports, LTD
Unit E, Riffa Business Park
Harrogate Road
Pool-In-Warfedale
North Yorkshire LS21 2RZ

License Agreement, dated November 8, 2007
Hinge-It Corporation
Richard B. Lowe
5108 Riverview Drive
Indianapolis, IN 46205

Sales Representative Agreement
John Burke & Associates
90 Overlook Drive
New Canaan, CT 06840

Sales Representative Agreement
Klatt-Jorwic & Associates, Inc.
P.O. Box 1385
Elmhurst, IL 60126-1385

Sales Representative Agreement
Lee Marketing/Northern
4009 174th Crt NE
Redmond, WA 98052

Sales Representative Agreement
Merchandise Group
8905 Symmes Trace Ct.
Loveland, OH 45140

Sales Representative Agreement
Mingerink & Associates
3341 Ashton S.E.
Grand Rapids, MI 49546

Sales Representative Agreement
Moran Sales, Inc.
1525 Hamlet
Troy, MI 48084

Sales Representative Agreement
Morgan & Sampson USA
11155 Dana Circle
Cypress, CA 90630

Sales Representative Agreement
Premium Products Int'l, Inc.
450 Island Road, #18
Ramsey, NJ 07446

Sales Representative Agreement
Rebull International Corp.
Attn: David Brosius/Alberto E. Bustillo
PO Box 144617
Coral Gables, FL 33114

Sales Representative Agreement
Southern Buckeye Marketing, Inc.
1605 Cedar Lane
Raleigh, NC 27614

Sales Representative Agreement
Synergy Marketing, Inc.
13801 Industrial Park Blvd.
Minneapolis, MN 55441

License Agreement dated December 1, 2000
Team Spirit Design, Inc.
831 Broadway
New York, NY 10003

Independent Contractor Agreement, dated January 24, 2008
Zhang Hong
B801 YA-LE-XUAN
#90 Tiangui Road, Huadu District
Guangzhou City, China 510800

## <u>SCHEDULE 2.1(a)(xvi)</u>

## Non-Transferred Permits

None.

## <u>SCHEDULE 2.2(a)(iii)</u>

## **Post-Petition Accounts Payable[1]**

1. Standby letters of credit and other payment obligations related to inventory in transit.
2. Administrative costs in connection with the termination of the Seller's 401(k) plan and the issuance of a final determination letter.

---

[1] Post-Petition Accounts Payable being assumed only to the extent they are not paid by Seller or cannot otherwise be satisfied in Seller's Chapter 11 Case (as defined in the Asset Purchase Agreement).

**Post-Petition Employee Compensation[2]**

| | |
|---|---|
| DAWN BAMERT | ALEXANDER INGRAM |
| SHARON BOYER | RUSSELL LACOSTE |
| MARK BROWN | STEVEN LAMBECK |
| ANGELA BURK | HONG-NGOC LE |
| TRACY BUTTRY | HAYDN LE CLAIRE |
| DANYELLE CAULFIELD | MICHAEL MATLOCK |
| JO CERESIA | SHERI MOISE |
| MICHAEL CERESIA | THOMAS NANCE JR |
| MICHELLE CLARKE | JAMES NAY |
| JOHN CLEMSON | BE NGUYEN |
| TIMOTHY CONDON | SON THIEU NGUYEN |
| LAURICE DANIEL | SHELLY NIEMEYER |
| LESLIE FOGARTY | DUNG PHAN |
| SANDRA GAFFNEY | ANTHONY RIBAUDO |
| DARRYL GILLESPIE | STEPHEN SCHOONOVER |
| JAMES GLENN | CHRISTOPER SMITH |
| PAUL HAUSER | NHIEN TRAN |
| KENNETH HERRON | HELGA TUCKER |
| MARY HILL | TAMMY TUCKER |
| THANH HUYEN | KRISTEN WEDEKIN |
| HOANH HUYNH | CATHERINE ZIEGELMEYER |

---

[2] Post-Petition Employee Compensation being assumed only to the extent they are not paid by Seller or cannot otherwise be satisfied in Seller's Chapter 11 Case (as defined in the Asset Purchase Agreement).

**Allowed Professional Compensation[3]**

| Professional | Compensation |
|---|---|
| 1. Thompson Coburn, LLP | All fees and expenses allowed by the Bankruptcy Court to the extent not paid by Seller. |
| 2. Clayton Capital Partners, Inc. | The Contingent Fee due and payable to Clayton Capital Partners, Inc. ("CCP") pursuant to engagement letter dated October 6, 2009 between Seller and CCP to the extent not paid by Seller. |

---

[3] Allowed Professional Compensation being assumed only to the extent they are not paid by Seller or cannot otherwise be satisfied in Seller's Chapter 11 Case (as defined in the Asset Purchase Agreement)

**Excluded Contracts**

1. Employment offer letter with James Nay dated April 16, 2009
2. Employment offer letter with James R. Schmidt II dated February 19, 2008
3. Employment, Non-Disclosure and Non-Compete Agreement with James L. Glenn dated January 19, 2006
4. Employment, Non-Disclosure and Non-Compete Agreement with Mark Brown dated January 19, 2006

## SCHEDULE 2.3(e)

## Excluded Assets Not Otherwise Listed in Section 2.3

None.

## <u>SCHEDULE 4.6</u>

## Legal Proceedings

1. Anti-dumping duties have been imposed on the Seller, pursuant to United States Department of Commerce's anti-dumping duty proceeding (Floor-Standing Metal-Top Ironing Tables (A-570-888), Since Hardware (Guangzhou) Co. Ltd., Federal Register, Sept. 28, 2005 (Vol. 70, No. 187), pp. 55631-55634. Since Hardware (Guangzhou) Co. Ltd. is in the process of appealing its liability under the proceeding. Seller, as an interested party, is participating in the appeal.

2. Seller is a party to other Legal Proceedings identified on Seller's Voluntary Petition filed November 21, 2009 for Seller's Chapter 11 Case, none of which Seller expects to have a Material Adverse Effect on the Business.

## **SCHEDULE 4.8**

### **Brokers**

Seller engaged Brent Baxter of Clayton Capital Partners, Inc. in St. Louis, Missouri to serve as Chief Sales Officer of the Seller in connection with the proposed sale of Seller's assets under Section 363 of the Bankruptcy Code.

## SCHEDULE 4.9

### Intellectual Property

Bajer Design & Marketing, Inc. has filed a patent infringement suit against the Seller in United States District Court for the Northern District of Illinois challenging Seller's use of certain Intellectual Property. Seller is disputing the claim in good faith.